**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**MMR CORP. and James B. Rutland,**
**Defendants–Appellants.**

**No. 91–3108.**

United States Court of Appeals,
Fifth Circuit.

Feb. 19, 1992.

Donald L. Beckner, Henry D.H. Olinde, Jr., Baton Rouge, La., for Rutland.

Timothy E. Kelley, M. Nan Alessandra, New Orleans, La., Michael D. Hunt, Baton Rouge, La., for MMR Corp.

John Fonte, U.S. Dept. of Justice, Antitrust Div., John J. Powers, III, Robert B. Nicholson, Asst. Chiefs, Washington, D.C., for U.S.

Before REYNALDO G. GARZA and GARWOOD, Circuit Judges, and MAHON *, District Judge.

GARWOOD, Circuit Judge:

A year and a half after their convictions for participating in a conspiracy to rig bids on an electric utility project, MMR Corporation (LA) (MMR) and its president James B. Rutland (Rutland) filed motions for a new trial based on newly discovered evidence in the form of an alleged recantation by one of the government's primary witnesses. The district court denied their motion. MMR and Rutland bring this appeal challenging the district judge's refusal to recuse himself, the denial of their request for an evidentiary hearing, and the denial of their request for a new trial. We affirm.

**Facts and Proceedings Below**

MMR's and Rutland's convictions arose from the bidding on and performance of a construction contract for an electrical generating plant operated by Cajun Electric Power Cooperative (Cajun Electric) in New Roads, Louisiana. In 1980, Cajun Electric was soliciting bids for the construction of the third unit of the project, known as the Big Cajun No. 2 Power Station. MMR was among the seven companies invited to submit bids for the prime electrical contract in September 1980, but was not among the four companies that ended up submitting bids on January 16, 1981. The low bidder was Fischbach & Moore, Inc. (F & M), which was awarded the contract for $21.3 million. MMR received a $4.3 million subcontract from F & M.

On November 3, 1988, a four-count indictment was returned against MMR and Rutland, charging them with joining and aiding and abetting a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and of joining and aiding and abetting a scheme to defraud Cajun Electric in violation of the mail fraud statute, 18 U.S.C. § 1341. The most damaging testimony at MMR and Rutland's trial came from two F & M officers, Paul Murphy (Murphy), who was in charge of the south-

east region for F & M, and J.R. Sturgill (Sturgill), the New Orleans area branch manager. Murphy testified that in December 1980, shortly after F & M had received the plans and specifications for the Big Cajun job in order to prepare its bid, the president of F & M's holding company called him and said that none of the other national companies on the bid list were interested in the Big Cajun job, and that Murphy should try to work something out with the one local company on the list, MMR. The national companies had been conspiring for several years by sharing bid information and dividing large projects among themselves.

Accordingly, Murphy arranged a lunch at the City Club in Baton Rouge on December 19, 1980 that included himself and Sturgill from F & M, and Rutland and MMR's chairman Robert McCracken (McCracken) from MMR. Murphy testified that he told Rutland and McCracken that all of the other bidders were willing to support F & M by submitting higher bids, so that he lacked only MMR's cooperation. Rutland and McCracken tried to convince Murphy that F & M should accept MMR as a partner on the job, but Murphy was opposed. Murphy testified that with negotiations stalled at that point, he and Rutland went to the men's room, where they reached an agreement that MMR would receive a subcontract from F & M marked up at the same level as the overall contract.

Murphy further testified that several days before the January 16, 1981 bid date, he met with Rutland and McCracken in F & M's New Orleans office to compare estimates, and that they agreed that the realistic cost for the job was just under $17 million. Murphy then went into his office and telephoned representatives from the other bidders with that number. One of them was adamant that MMR be made the high bidder on the job, because he was concerned that if MMR put in the second lowest bid, MMR might be awarded the job because of its close relationship with Cajun Electric, and after receiving a contract of that magnitude might become a competi-

* Senior District Judge of the Northern District of    Texas sitting by designation.

tive threat to the national contractors. When Murphy told Rutland and McCracken that they had to put in the highest bid, they resisted because they felt that it could damage their reputation with Cajun Electric. Murphy testified that when the meeting broke up, he believed that Rutland and McCracken were unhappy about the arrangement, but were still going to comply. MMR ended up not putting in a bid at all, but Murphy testified that he still felt obligated to follow through on the subcontract deal. Sturgill handled the subcontract with MMR.

At trial Sturgill offered testimony consistent with that of Murphy regarding the City Club meeting, and elaborated on the MMR subcontract. Sturgill stated that he attended the City Club lunch, that Murphy informed Rutland and McCracken that he needed MMR's cooperation on the upcoming bid, and that Murphy and Rutland announced upon returning from the men's room that they had a deal (although Sturgill could not recall if he learned the details of the deal at that time or later). He further testified that he negotiated the subcontract with Rutland. The government produced a sheet of calculations on Rutland's stationery and in his handwriting showing that they had calculated total costs for the subcontract work at $2,853,487 and had added a "fee" of $1,500,000, resulting in a total subcontract for MMR of $4,353,487. Sturgill testified that he argued to Murphy that this markup was excessive, because he understood that they had agreed to give MMR 30 percent above actual cost. Murphy replied that the $1.5 million reflected the deal he had made, and he felt committed to it.

Sturgill also testified, as was borne out by the handwritten calculations, that he and Rutland agreed not to include the full amount in the subcontract initially, because F & M was required to report all subcontracts to Cajun Electric on a Rural Electrification Administration (REA) form, and Sturgill was concerned that Cajun Electric might become suspicious that the higher

number was excessive for the work specified in the subcontract. He and Rutland therefore agreed that F & M would include $1 million of the agreed price through a change order on or before May 1, 1983. A change order is an adjustment to a contract that typically reflects additional and unforeseen labor or material costs. In August 1981, F & M and MMR executed a subcontract for $3,353,487, and in November 1981 they executed a $1,120,000 change order.[1]

The jury convicted MMR and Rutland on all counts. MMR was fined $1,000,000 on the antitrust count and $1,000 on each of the mail fraud counts, and Rutland was fined $103,000 and sentenced to six months' imprisonment. This Court affirmed the convictions on July 23, 1990. *United States v. MMR Corp. (LA)*, 907 F.2d 489 (5th Cir.1990), *cert. denied sub nom. Rutland v. United States*, — U.S. —, 111 S.Ct. 1388, 113 L.Ed.2d 445 (1991). Rutland's and MMR's petitions for rehearing were denied on October 9, 1990.

On November 26, 1990, Sturgill came to Rutland's attorney's office and gave a sworn statement that Rutland and MMR claim recants critical trial testimony. Specifically, Sturgill stated that Rutland had informed Murphy and Sturgill at the City Club meeting that MMR would not be able to meet the bonding requirements for the Big Cajun job, and F & M therefore did not view MMR as a potential competitor for the Big Cajun contract. Sturgill also stated that there was some validity to the change order—that it was not a complete sham with the sole purpose of paying MMR an extra $1 million without drawing the attention of Cajun Electric. Sturgill explained that the prosecutor, Hays Gorey (Gorey), had used Sturgill's impending sentencing to intimidate him into giving misleading testimony at trial.

Based on Sturgill's sworn statement, Rutland and MMR filed motions under Federal Rule of Criminal Procedure 33 on De-

---

1. Sturgill testified that the extra $120,000 in the change order represented payment for bona fide

heat tracing work actually performed by MMR.

cember 21, 1990 and January 4, 1991, respectively, requesting that their convictions be vacated and that they be granted a new trial. They filed the motions with Judge Henry A. Mentz, Jr., who had presided over their original trial. On December 26, 1990, the district court granted Rutland's motion for an expedited hearing, and set the hearing for January 9, 1991. On January 8th, the court continued Rutland's hearing until January 23rd, and indicated that, as no request had been made to convert the hearing to an evidentiary hearing, no witnesses would be heard. Later the same day Rutland filed a motion formally requesting an evidentiary hearing. The motion was denied on January 14th.

The following day, January 15, 1991, Sturgill gave a second sworn statement to Rutland's attorney containing more direct repudiations of his trial testimony. On January 18th, Rutland filed a motion pursuant to 28 U.S.C. §§ 144 and 455 asking that Judge Mentz recuse himself from presiding over the motion to vacate the conviction and obtain a new trial. Judge Mentz denied the recusal motion and both motions for new trial on January 23, 1991. MMR and Rutland bring this appeal challenging the denial of the recusal motion, the denial of the request for an evidentiary hearing, and the denial of the motions for new trial.

## Discussion

### I. Motion for Recusal

■ The basis for Rutland's recusal motion was threefold: (1) At Rutland's sentencing on July 28, 1989, Judge Mentz suggested that Rutland had rigged bids on prior occasions, and he implied that a practice of bid-rigging might help to explain MMR's dramatic growth; (2) Judge Mentz allegedly assumed that an attempted *ex parte* communication by Rutland's pastor was attributable to Rutland and his attorney; and (3) Judge Mentz denied Rutland an evidentiary hearing on his motion for a

new trial. Judge Mentz evaluated the motion, which referred to both 28 U.S.C. §§ 144 and 455, primarily under section 144, since Rutland had submitted an affidavit as specified in that section. Section 144 directs that a judge reassign a case when a party "makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party." We review the denial of a motion for recusal solely for an abuse of discretion. *United States v. Merkt,* 794 F.2d 950, 960 (5th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987).

### A. Comments at Sentencing

■ At the sentencing hearing, Judge Mentz stated that he could not view the conspiracy for the Big Cajun bid in isolation, because the testimony adduced at trial showed that Murphy and Rutland had worked together to rig previous bids. He noted that MMR had earned a sizable profit as a result of its agreement with F & M, and that "apparently these deals were one of the reasons that MMR became so successful over the years." Rutland contends that these comments evidence Judge Mentz's personal bias against him.

At the hearing on January 23, 1991, Judge Mentz ruled that insofar as Rutland's recusal affidavit was based on these comments, it was not timely, because the matter should have been raised on appeal. He further ruled that the comments would not require recusal because they did not demonstrate bias of an extrajudicial origin.

We agree that the motion does not appear timely as to the sentencing remarks,[2] and that in any event it is clear that it wholly fails to show adequate grounds for recusal. On their face, Judge Mentz's remarks were comments on the evidence that he had heard in the case: Murphy and Sturgill testified that part of the order of business at the City Club luncheon was

---

**2.** Although the statute requires that the party file the affidavit "not less than ten days before the beginning of the term at which the proceeding is to be heard," 28 U.S.C. § 144, with the abolition of formal court terms this requirement has been replaced by one that the party "exercise reasonable diligence in filing an affidavit after discovering facts that show bias," *Pomeroy v. Merritt Plaza Nursing Home, Inc.,* 760 F.2d 654, 658 (5th Cir.1985) (per curiam).

clearing MMR's obligations to F & M, incurred on several previous projects for which F & M had supported MMR's bid. As such, Judge Mentz's comments are of a type that cannot ordinarily furnish the basis for recusal: "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *accord Merkt*, 794 F.2d at 960.

■ Although recusal may be required in a case where pervasive bias or prejudice manifests itself only through judicial conduct, *United States v. Holland*, 655 F.2d 44, 47 (5th Cir. Unit B 1981) (per curiam), no such showing has been made here. Judge Mentz's comments at sentencing were not gratuitous; rather, a review of the transcript of the sentencing hearing shows that they were made largely in response to defense counsel's argument that a light sentence was called for because MMR was "an American success story" fueled by the leadership and creativity of Rutland. Also, in trying to "balance the equities of both positions," Judge Mentz noted immediately following the challenged remark that MMR was a "good company" and that he had received many letters from people concerned about the impact of the trial on the company. Therefore, the comments do not reflect gratuitous opposition to Rutland, and it is entirely clear that it was well within the district court's discretion to conclude that they did not reflect pervasive bias that would prevent the court from objectively evaluating Rutland's motion for new trial.

## B. Attempted Ex Parte Communication

■ Rutland's second piece of evidence to support his recusal motion is that when Judge Mentz unexpectedly received a package from the pastor of Rutland's church on January 7, 1991, he had his clerk call Rutland's attorney to pick it up, rather than calling the pastor himself. Rutland argues that we may infer Judge Mentz's belief

that Rutland instigated the attempted *ex parte* contact, and that we should view this as further evidence of Judge Mentz's bias.

The inferences we are asked to draw are both much too attenuated and too weak to establish bias. Judge Mentz did not accuse Rutland or his attorney of soliciting an improper attempt to affect Rutland's case. The pastor's submission *was* on behalf of Rutland, and whether or not the judge believed Rutland knew about it, it was entirely appropriate for him to place upon Rutland's legal representative in his court the responsibility of correcting the problem. This ground, too, is wholly without merit.

## C. Denial of an Evidentiary Hearing

■ The district court denied Rutland's request for an evidentiary hearing on January 8, 1991, the same day it received the government's memo in opposition to Rutland's request. Rutland argues that this denial of an opportunity to test Sturgill's and Gorey's credibility was further evidence of Judge Mentz's prejudice against him. In our view, however, this meritless argument is foreclosed by the principle that adverse rulings in a case are not an adequate basis for demanding recusal. *See Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921); *United States v. Phillips*, 664 F.2d 971, 1002–03 (5th Cir.1981), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

## D. Section 455

■ Rutland's motion also referred to 28 U.S.C. § 455, which requires a judge to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned" (§ 455(a)), or "[w]here he has a personal bias or prejudice concerning a party" (§ 455(b)(1)). However, in a situation such as this one, which does not involve any circumstance creating a public appearance of impropriety, his claim would fare no differently under that section. We have held that substantively the two sections are " 'quite similar, if not identical.' " *United States v. York*, 888 F.2d 1050, 1053 (5th Cir.1989) (quoting *Chitimacha Tribe v.*

*Harry L. Laws Co.,* 690 F.2d 1157, 1165 (5th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983)). Specifically, as is pertinent for this case, section 455 also embodies a timeliness requirement, *id.* at 1053–55; *Delesdernier v. Porterie,* 666 F.2d 116, 121–23 (5th Cir.), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982), and also applies only to personal, extrajudicial bias, *In re Corrugated Container Antitrust Litigation,* 614 F.2d 958, 965 (5th Cir.), *cert. denied sub nom. Mead Corp. v. Adams Extract,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).

All of the recusal complaints are totally meritless.

## II. Denial of an Evidentiary Hearing

■ MMR and Rutland's next point of error is that the district court erred in denying them an evidentiary hearing. While conceding the general rule that a trial judge has discretion to deny motions for a new trial without an evidentiary hearing, *United States v. Chagra,* 735 F.2d 870, 873 (5th Cir.1984); *United States v. Hamilton,* 559 F.2d 1370, 1373 (5th Cir.1977); *United States v. Curry,* 497 F.2d 99, 101 (5th Cir.) (per curiam), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 311 (1974), they contend that, given their allegations of false testimony by a chief government witness and misconduct by the prosecutor, the court's failure to hold an evidentiary hearing to investigate those charges constituted an abuse of discretion.

Although we did note in *Hamilton* that evidentiary hearings are usually ordered because of "certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession," *Hamilton,* 559 F.2d at 1373, we did not hold that any of those circumstances would compel such a hearing. Indeed, in *Chagra* we held that it was not an abuse of discretion for the district court to deny a motion for new trial without an evidentiary hearing when presented

with charges that the government had knowingly used false testimony. *See Chagra,* 735 F.2d at 874.

As in *Chagra,* it was within the court's discretion here to conclude that a thorough inquiry into the basis for the motion could be conducted without an evidentiary hearing. The motion was not based primarily on "newly discovered evidence" in the sense of matters not discussed at trial; rather, it was based on Sturgill's supposed recantation of some of his statements at trial.[3] The district court engaged in a detailed comparison of Sturgill's November 26th affidavit and his trial testimony and found that the few inconsistencies were not material, a determination that would not likely have been affected by an evidentiary hearing. *See id.* at 873. Although the January 15th affidavit did recant material testimony, MMR and Rutland never requested that the district court reconsider its January 14th order. Moreover, the court had already had ample opportunity to evaluate Sturgill's credibility during his more than four days of trial testimony, including at least two days of cross-examination, and concluded that the recantations in the January 15th statement were not credible. We have indicated that the acumen gained by the trial judge in presiding over the course of the trial makes Rule 33 motions directed to the same judge "particularly suitable for ruling without a hearing." *Hamilton,* 559 F.2d at 1373. The only issue on which an evidentiary hearing might have been useful was the charge of misconduct and coercion by the prosecutor Gorey, and as discussed in Part III below, the court did not rely on the absence of prosecutorial misconduct in denying the motion.

## III. Denial of the Motion for New Trial

■ The general rule is that newly discovered evidence will not entitle a defendant to a new trial under Rule 33 unless the evidence *probably* would produce a dif-

---

**3.** By contrast, in *Richardson v. United States,* 360 F.2d 366 (5th Cir.1966), where we remanded a motion for new trial because the district court failed to conduct an evidentiary hearing, the basis for the motion was an allegation that a principal prosecution witness had engaged in a conversation with a juror, which could not be resolved by reference to the trial record.

ferent result. *United States v. Adi,* 759 F.2d 404, 407 (5th Cir.1985). However, if the government used false testimony and knew or should have known of its falsity, a new trial must be held if there was *any reasonable likelihood* that the false testimony affected the judgment of the jury. *United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979); *see also United States v. Lopez–Escobar,* 920 F.2d 1241, 1246 (5th Cir.1991). In addition, a defendant seeking a new trial based on newly discovered evidence must show that (1) the evidence was unknown to him at the time of trial, (2) his failure to learn of the evidence was not due to a lack of diligence, and (3) the evidence is material, not merely cumulative or impeaching. *Lopez–Escobar,* 920 F.2d at 1246; *United States v. Miliet,* 804 F.2d 853, 859 (5th Cir.1986); *United States v. Vergara,* 714 F.2d 21, 22 (5th Cir.1983). We have stressed that district courts have "considerable discretion" with respect to Rule 33 motions. *United States v. Simmons,* 714 F.2d 29, 31 (5th Cir.1983); *see also Adi,* 759 F.2d at 407 (a "clear abuse of discretion" must be demonstrated).

## A. November 26th Statement

■■■ The district court found that very little of Sturgill's first sworn statement could even be considered newly discovered evidence, because it was largely consistent with his trial testimony. At no point in his November 26th statement did Sturgill specifically recant his trial testimony or direct-

ly state that it was untruthful.[4] The court found that the few seemingly inconsistent statements were neither credible nor material.

Rutland and MMR contend that the November 26th statement contains recantations of ten facts that were established at trial solely through Sturgill's testimony: (1) that he was told at the City Club meeting that MMR intended to bid the Big Cajun job; (2) that he and Murphy told Rutland during the City Club meeting that the Big Cajun bids were rigged; (3) that he and Murphy understood upon leaving the City Club that MMR would participate in the conspiracy; (4) that prior to the bid date Murphy told him that MMR had agreed not to submit a bid; (5) that not bidding a job under these circumstances was tantamount to participation in the conspiracy; (6) that the change order executed for MMR was a complete sham; (7) that F & M used an inflated labor factor in its prime contract bid; (8) that a prior project performed by MMR—the Strategic Petroleum Reserve project at Hackberry—had been rigged, and that MMR agreed to pay F & M $250,-000 for its cooperation on that project; (9) that MMR's sharing of bid information was anticompetitive activity; and (10) that two other prior projects—the Borden and Freeport projects—had been rigged.

The district court found that with respect to items 2, 3, 6, 9, and 10, the statement was not inconsistent with the trial testimony. We agree with this holding.[5] We fur-

---

**4.** Despite repeated attempts by Rutland's attorney to elicit an admission that he had testified falsely at trial, Sturgill allowed only that although in his mind the statements were truthful, his testimony was "slanted" in the government's direction and "the outcome could be construed to be inaccurate on some of the issues." At many of the points in his statement now emphasized to this Court by Rutland and MMR, there was no reference whatsoever to his trial testimony, so the alleged "recantations" amount at most to discrepancies, often following leading questions by Rutland's attorney.

**5.** Two examples will demonstrate the manner in which the asserted contradictions do not withstand scrutiny. On item 2, Sturgill stated in his November 26th statement only that *he* did not tell Rutland that the Big Cajun bids were rigged. This does not conflict with his trial testimony,

in which he stated that *Murphy* had told Rutland and McCracken that the other bidders had agreed to support F & M.

On item 6, Sturgill's relevant trial testimony was that the $1,120,000 change order in favor of MMR was executed pursuant to a prior agreement between Rutland and Sturgill, not because of any new work that arose during performance of the contract, but that $120,000 of the change order represented legitimate work for heat tracing; that the subcontract was split up into a base contract and a change order because he was uneasy that, upon submission of the REA form for approval, the full amount would be considered too high for the work involved; and that specific items on the change order, such as "additional electrical work as required associated with a complete heat tracing system" for $421,000, and "supply technical and engineering services as required" for $125,000, did not repre-

ther find that the district court was within its discretion in concluding that none of the remaining items constituted material or credible discrepancies. Item 1 relates solely to whether, at the time of the City Club meeting, Murphy and Sturgill believed that MMR was capable of bidding for the prime Big Cajun contract. Although there were some indications both ways at trial,[6] we explained in our prior opinion that the possibility that Murphy and Sturgill knew that MMR could not bid for the project was not inconsistent with their seeking, and obtaining, MMR's participation in the conspiracy: particularly given their close relationship with Cajun Electric, Rutland and MMR could have furthered the conspiracy even if they would not have ultimately been able to procure the job themselves. *See MMR Corp.*, 907 F.2d at 498. Item 4 relates to whether Murphy told Sturgill prior to the bid date that an agreement had been reached that MMR would not bid, rather than that they would submit a complementary bid. Again, this issue is one for which there was already disagreement in the trial testimony, and one for which the discussion in our prior opinion demonstrates that the disagreement was not material. Murphy testified at trial that he did not learn until after the bid that MMR had decided not to

submit a bid at all, so Sturgill's recantation merely makes his testimony consistent with Murphy's on that point. We indicated in our prior opinion that whether or not the parties ever reached a specific agreement for MMR not to bid was not decisive. *See id.* at 495. Item 5 is an even more attenuated aspect of this same point, because it concerns whether Sturgill's concept of "supporting" a bid included not submitting a bid at all. It relates solely to Gorey's understanding of industry usage, not to any of the facts of this particular conspiracy. Items 7 and 8 are both very tangential to the question of MMR's role in the Big Cajun conspiracy.

### B. January 15th Statement

On January 15th, the day after the district court had denied an evidentiary hearing based on the first sworn statement, Sturgill gave a second statement to Rutland's attorney. The statement dealt almost entirely with Sturgill's interactions with Gorey in preparing for trial. Sturgill indicated that he allowed himself to be intimidated, and through repeated rehearsals of his testimony he forgot what he knew from personal memory and what he knew from Gorey's suggestions, and he let

---

sent genuine work on the project. In the November 26th statement, Sturgill again indicated that the change order was his idea and was the result of a prior arrangement, rather than conditions that arose during the job. When Rutland's attorney asked whether the reason for the arrangement was not that there was a restriction against subcontracting more than 40 percent of the work, Sturgill equivocated and then finally indicated that restriction was "a concern." He did *not* retract his statement that the change order served the purpose of preventing Cajun Electric from fully comparing the subcontract price to the listed work. When asked whether there was any validity to the change order, he responded that there was "some validity." He stated that Gorey had convinced him by going over the items one-by-one that there was no validity to the items on the change order, but that he now believed there was, including items for heat tracing, crane rental, and unloading and storing equipment. However, in the November 26th statement he also made remarks seemingly inconsistent with this new recollection, such as "I don't recall what the items were" and "since I was not on the job site at that time, there was no way of

knowing whether some of these items were done or not." In any event, discrepancies in his memory about the particular items do not call into question the essence of his testimony about the change order.

6. Sturgill did testify at trial that at the City Club meeting Rutland professed MMR's intent to bid on the job itself, and did contradict this testimony in his November 26th statement by indicating that Rutland told them at the City Club meeting that MMR did not have the bonding capacity for the job. However, Sturgill also *testified at trial that Murphy had indicated to him prior to the meeting that he did not think MMR was strong enough to bid for the job.* Murphy was in a position to know of MMR's capabilities: he testified that in the late 1970s he had been very interested in buying MMR, had examined their books, and had "looked into just about every aspect of this operation [MMR]." When asked at trial whether he was concerned about MMR's ability to actually bid and compete for the Big Cajun job, Murphy replied that based on MMR's relationship with Cajun Electric and the fact that MMR had persuaded Cajun Electric to put it on the bid list, he viewed MMR as a serious potential contender.

Gorey shape his testimony in a way favorable to the government. However, in the course of this statement, Sturgill made two assertions that were contrary to his trial testimony. He stated that, to his knowledge, Murphy and Rutland did not agree at the City Club to rig the Big Cajun bid, and that it was not his understanding that MMR got a subcontract in exchange for cooperating on the Big Cajun bid. He also stated that Gorey knowingly used testimony that was false.

The district court found that the alleged recantation was not credible. Additionally, although it did not credit Sturgill's charge that the government knowingly used false testimony, the court found that, given Murphy's testimony and a handwritten memo of Rutland's from the City Club meeting, the recantation failed to meet even the expansive test asking whether there was "any reasonable likelihood" that the false testimony affected the judgment of the jury.[7]

Having had the chance to observe Sturgill during more than four days of trial testimony and cross-examination, the district court was "exceptionally qualified" to pass on the credibility of the recanting affidavit. *Adi*, 759 F.2d at 409; *cf. Davis v. Blackburn*, 789 F.2d 350, 352 (5th Cir. 1986) (in a habeas case under 28 U.S.C. § 2254, noting the deference due a state judge's denial of a new trial based on re-canted testimony when the judge presided over the original trial). Several circumstances persuade us that the court's decision to disbelieve the recantations in the January 15th statement was within its broad discretion. First, many of Sturgill's answers in the sworn statement were equivocal and suggested that his memory about the events being discussed was very vague. For instance, when Rutland's counsel asked, "Are you saying it was Gorey that told you that MMR got a substantial contract in exchange for cooperating and putting the job together?", Sturgill responded, "Well, it was not my understanding. Paul Murphy didn't tell me that. So the only person that could have implied that would have been Hays Gorey."

Second, and even more persuasive to us, is that this was the second or third time that Sturgill had switched his story about the Big Cajun conspiracy in sworn testimony. In 1985, Sturgill appeared before a grand jury in Washington, D.C. and testified falsely that to his knowledge F & M was not involved in bid rigging in any way. At the trial in April 1989, of course, he gave completely contrary testimony. Then, in November 1989, after he had already been sentenced and presumably the government's leverage over him had been eliminated, he gave an affidavit for Cajun Electric's civil suit against F & M that was

---

7. Given the basis of the district court's holding, we see no reason to address MMR's argument that the district court erroneously failed to apply the "Larrison Rule" applicable in cases of recanted trial testimony. The rule, which comes from *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928), relaxes the normal standard for granting a new trial—whether the newly discovered evidence would *probably* produce an acquittal—by requiring merely (1) that the court be reasonably well satisfied that the testimony given by a material witness was false, (2) that without it the jury *might* have reached a different conclusion, and (3) that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial. MMR contends that this Circuit adopted the rule in *Newman v. United States*, 238 F.2d 861, 862 n. 1 (5th Cir.1956), and that although we have occasionally failed to apply it, *see, e.g., Adi*, 759 F.2d at 407, we have never overruled it. *See also Hamilton*, 559 F.2d at 1372–73 & nn. 5–

6, 1375 n. 9 (noting the existence of both tests, but finding that neither was met); *United States v. Nixon*, 881 F.2d 1305, 1311–12 (5th Cir.1989) (acknowledging that the *Adi* court followed the general rule rather than the Larrison Rule, but declining to resolve whether this Circuit still adheres to the Larrison Rule, because Nixon's motion would have failed under either test).

Here, the district court affirmatively indicated that it did not find Sturgill's recantation to be credible. Therefore, Rutland's and MMR's motions would have failed the first part of the Larrison Rule even if it had been applied. Moreover, the district court applied for the sake of argument the "any reasonable likelihood" standard, which seems at least as broad as the Larrison Rule. If the district court can be sustained on either of these grounds, therefore, its failure to apply the Larrison Rule is inconsequential, and we see no need to decide whether the failure to do so under other circumstances would be reversible error.

basically consistent with his trial testimony: he stated that the Big Cajun job was rigged and that he had personal knowledge that Rutland and McCracken had participated in the conspiracy. On November 26, 1990, he appeared in Baton Rouge at Rutland's request and gave a statement to Rutland's attorney that contained some discrepancies from his trial testimony, but he refused to admit that he had testified falsely at trial. Then, on January 15, 1991, a day after the district court denied an evidentiary hearing based on the first sworn statement, he for the first time repudiated his trial testimony.

Finally, the district court's decision not to overturn the outcome reached after full and adversarial presentation of evidence and testimony at trial is buttressed by the fact that many of the matters about which Sturgill supposedly recanted his testimony were transactions or events of which Rutland had firsthand knowledge. If, for example, Sturgill lied in testifying at trial that Murphy told Rutland and McCracken at the City Club that the Big Cajun job was rigged, or in testifying about the content of his meetings with Rutland to negotiate the subcontract, Rutland would have known this immediately. He was able to assist counsel in trying to impeach Sturgill, and could have taken the stand to do so himself. We have indicated that under such circumstances the evidence should not even be considered "newly discovered." *See United States v. Metz,* 652 F.2d 478, 480 (5th Cir. Unit A 1981).

## Conclusion

Because we find that the district court acted within its discretion in denying the recusal motion, denying an evidentiary hearing, and denying a new trial, the judgment of the district court is

AFFIRMED.