# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

No. 93-2320
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES OKORONKWO a/k/a
DERRICK, EKE BOKO CHUKS
a/k/a BOKO C. EKE, ONWEAZU
OKWECHIME a/k/a OWEN, TONET
JACKSON, EMMANUEL EZINWA
a/k/a EMMA EZINWA,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(February 17, 1995)

Before DAVIS, BARKSDALE and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Appellants in this criminal case are James Okoronkwo, Emmanuel Ezinwa, Onweazu Okwechime, Boko Chuks Eke and Tonet Jackson. All five were convicted for their role in a sizeable conspiracy to file false income tax returns with the United States government. Members of this conspiracy would recruit people to file tax returns and assist them in filling out fraudulent returns. Typically, these returns would claim that the filer was in the transportation business and had bought an enormous amount of fuel, entitling the person to a huge fuel excise tax credit and, consequently, a hefty tax refund. These returns were usually filed electronically through the rapid refund system at an office called Tax Sense.

When the refund check arrived, one of the conspirators would drive the filer to the bank to cash it, then collect the conspiracy's share of the refund. The conspirators were not generous: ordinarily, a filer would get to keep only $200 out of a $3000 refund.

The suspicious nature of these returns did not go unnoticed by the IRS. The similar characteristics of the numerous returns filed through Tax Sense tipped them off. In almost every case, a credit for diesel fuel was claimed, for which the rate of the motor fuel tax is highest. The returns reported insufficient gross receipts for the amount of fuel claimed to have been purchased. The amounts of fuel claimed to have been purchased exceeded the amounts the taxpayers could have used.[1] Most of the returns showed no gross income and no withholding. The IRS noted that the returns did not reflect any of the expense deductions that would normally be claimed by a business. Many of the returns showed the same address, which often was a post office box. Often the filers claimed head of household status, enabling them to receive higher refunds as well. Also, most claimed the earned income credit. Finally, in order to obtain refund anticipation loans on their refunds, the filers typically claimed refunds of just under $3,000,

_____

[1]Most of the returns claimed fuel usage of approximately 20,000 gallons. One of the government's witnesses explained at trial why such an amount seemed highly suspicious: in order to consume 20,000 gallons of fuel, assuming 15 miles per gallon, a taxpayer would have to have driven at least 300,000 miles per year, or 821 miles per day. Even assuming a constant driving speed of 65 miles per hour, that would entail driving nonstop 12.6 hours a day every single day of the year.

2

the maximum refund anticipation loan a taxpayer could receive through the electronic filing system.

## I.   SUFFICIENCY OF THE EVIDENCE

All five appellants challenge the sufficiency of the evidence underlying their convictions.  The ground rules for reviewing the sufficiency of the evidence are familiar.  A conviction will stand if a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt.  United States v. Pofahl, 990 F.2d 1456, 1467 (5th Cir. 1993).  The jury is free to choose among reasonable constructs of the evidence and does not have to exclude every reasonable hypothesis of innocence.  United States v. Maseratti, 1 F.3d 330, 337 (5th Cir. 1993).  All inferences from the evidence must be viewed as supporting the verdict.  United States v. Basey, 816 F.2d 980, 1000-02 (5th Cir. 1987).  The jury is entitled to believe a witness unless the testimony is so incredible that it defies physical laws.  United States v. Lerma, 657 F.2d 786, 789 (5th Cir. 1981), cert. denied, 455 U.S. 921 (1982).

All defendants were charged with varying counts of violations of 18 U.S.C. § 287 (aiding and abetting the filing of false tax returns) and/or 18 U.S.C. § 286 (conspiracy to defraud the U.S. through the filing of false returns).

To establish a violation of 18 U.S.C. § 287, the Government must prove (1) that the defendant presented a false or fraudulent claim against the United States; (2) that the claim was presented to an agency of the United States; and (3) that the defendant knew

3

that the claim was false or fraudulent. *See* <u>United States v. Miller</u>, 545 F.2d 1204, 1212 n. 10 (9th Cir. 1976).

To prove a defendant guilty of violating 18 U.S.C. § 286, the Government must establish: (1) that there was a conspiracy to defraud the United States; (2) that the defendant knew of the conspiracy and intended to join it; and (3) that the defendant voluntarily participated in the conspiracy. *See* <u>United States v. Orr</u>, 864 F.2d 1505, 1509 (10th Cir. 1988); *see also*, <u>Pofahl</u>, *supra,* 990 F.2d at 1467.

Participation in a conspiracy need not be proven by direct evidence: "a conspirator's knowledge and intent can be shown by circumstantial evidence," <u>United States v. Judd</u>, 889 F.2d 1410, 1415 (5th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1036 (1990), and "a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" <u>United States v. Robertson</u>, 659 F.2d 652, 656 (5th Cir. 1981) (quoting <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942), and <u>United States v. Marx</u>, 635 F.2d 436, 439 (5th Cir. 1981)).

None of the appellants challenge the sufficiency of the evidence on the existence of a conspiracy or the falsity of the returns at issue. Instead, each argues that there was insufficient evidence to prove intent to join or participation in the conspiracy. Those challenging their convictions on the substantive false claim counts assert that there was insufficient evidence of criminal intent. We will address each defendant's claim separately below.

4

*James Okoronkwo*

Okoronkwo was convicted on four counts of aiding and abetting the filing of false tax returns in violation of 18 U.S.C. § 287 and one count of conspiracy to defraud the U.S. through the filing of false tax returns in violation of 18 U.S.C. § 286.

According to the filers he recruited, James Okoronkwo assisted with the filing of at least six false returns through Tax Sense, transported at least two of the filers to the bank to cash their refund checks, and collected all but $200 of each of their refunds. He helped one of the filers obtain a fake identification card and file a false return under a fictitious name. Okoronkwo also filed a false return of his own. He obviously was aware that the information in his own return was incorrect. The evidence clearly supports his four aiding and abetting convictions.

The evidence also supports the conspiracy conviction. Okoronkwo's modus operandi was identical to that used in the conspiracy. The returns filed were similar to other returns filed as part of the illegal scheme. Moreover, his false returns were filed through Tax Sense. Additionally, one of the filers testified that Oganni Obi, the father of the conspiracy, was present at Tax Sense when she and Okoronkwo went there. The same filer stated that both Okoronkwo and Obi told her that the filing of her returns was part of a "program" for low income people. From this, the jury reasonably could have concluded that Okoronkwo was a member of this conspiracy. We reject Okoronkwo's sufficiency of the evidence claim.

## Emmanuel Ezinwa

Ezinwa was convicted on one count of conspiring to defraud the United States by filing false, fictitious or fraudulent tax returns in violation of 18 U.S.C. § 286.

Henry Clement, a co-conspirator cooperating with the government, was the primary witness against Ezinwa. He described Ezinwa as the third-ranking member of the conspiracy, working hand-in-hand with Oganna Obi, the ringleader of the conspiracy. Clement testified that Obi had referred to Ezinwa as his best recruiter. Clement testified Ezinwa was involved in "transportation" and acted as "policeman" to make sure filers forked over the lion's share of the refund money to the conspiracy. He stated that he had personally observed Ezinwa bringing people he had recruited to Tax Sense to pick up their refund checks, taking them to the bank to cash the checks, and returning with money. Clement also saw Ezinwa bringing forms to Tax Sense for transmission, stating that Ezinwa was "there all the time with documents." The jury was entitled to believe Clement if it wanted to, and it apparently did. We find that the evidence was sufficient to support Ezinwa's conviction.

## Onweazu Okwechime

Okwechime was convicted on two counts of aiding and abetting the filing of false tax returns in violation of 18 U.S.C. § 287 and one count of conspiracy to defraud in violation of 18 U.S.C. § 286. Two witnesses provided sufficient evidence to convict Okwechime: Clement and a recruited filer named Bibian Nzurum.

6

Ms. Nzurum's testimony clearly establishes that Okwechime aided and abetted in the filing of her false return. There was also sufficient evidence for the jury to find that Okwechime was involved in the filing of a false return in the name of Michael Okwechime. Thus, there is sufficient evidence for the jury to conclude that Okwechime had committed two counts of aiding and abetting.

With regard to the conspiracy conviction, a careful review of Ms. Nzurum's testimony reveals that Okwechime did not exactly follow the typical pattern of activity used by the conspiracy in his dealings with her. For example, he told her he would take only one third of the refund as his fee; the other conspirators usually took all but $200 of the filers' refunds. Nor did Okwechime accompany Nzurum to the bank to cash her check, which was the normal modus operandi of the conspiracy. Also, Nzurum denied ever going to Tax Sense and claimed never to have heard of it. However, the return Okwechime produced for Nzurum reflected the predictable fuel tax credit, totally in keeping with the practice of the conspiracy. In truth, Ms. Nzurum was not engaged in the transportation business and had not purchased the fuel reflected on the return. She testified that Okwechime filled out the return and that she had given him only her name, social security number, and W-2 form. Moreover, Clement testified that Okwechime was "involved" with the conspiracy and brought documents to Tax Sense. The jury reasonably could have believed Clement, an admitted co-conspirator, when he testified that Okwechime was in on the

7

conspiracy. We conclude that the evidence was sufficient to convict Okwechime.

*Boko Chuks Eke*

Eke was convicted on one count of conspiracy to defraud in violation of 18 U.S.C. § 286. Remarkably, Eke contests his conviction merely by adopting Ezinwa's argument on the insufficiency of the evidence. The issue of whether there was sufficient evidence to convict Ezinwa is irrelevant to the issue of Eke's conviction. Ordinarily, we treat any assignment of error not briefed as waived. However, we note that the evidence against Eke is overwhelming and clearly was sufficient for a conviction on the conspiracy count. Clement testified that Eke got social security cards for filers who participated in the scheme. Clement also stated that Eke got the names for the cards from Obi, filed a false return in his own name, and helped another person file a false return. A reasonable jury could have convicted Eke based on this information. We reject Eke's argument that the evidence was insufficient to convict him.

*Tonet Jackson*

Jackson was convicted on four counts of aiding and abetting the filing of false returns in violation of 18 U.S.C. § 287 and one count of conspiracy to defraud the U.S. through the filing of false returns in violation of 18 U.S.C. § 286. Jackson concedes there was sufficient evidence to convict her on the aiding and abetting counts. She argues she had no deliberate, knowing, specific intent to join the larger conspiracy, of which she claims to be unaware.

8

We have carefully reviewed the trial transcript in order to determine whether there was sufficient evidence to convict Tonet Jackson on the conspiracy count. Tonet Jackson filed her own false tax return, transmitted through Tax Sense, which reflected a large fuel tax credit to which she clearly was not entitled. The testimony of two of the filers she recruited, Yolanda Armstrong and Nicole Hawkins, establishes that Jackson told them that they could receive incentive money from the government to help them stay in school. She told them that her uncle could file their tax returns and that they would receive money. When Armstrong noticed that the address on her check was incorrect and that it was for $2,800 rather than the $500 amount she had been told, Jackson told her not to worry about it. Jackson implied that the discrepancies had something to do with the rapid refund. Armstrong also asked whether she could keep the papers she had received at Tax Sense, to which Jackson replied that Armstrong did not need them. Jackson retrieved the papers and put them in her glove compartment. Jackson's carefully crafted responses to Armstrong's voiced suspicions about the legality of the scheme and the seemingly delft manner in which she "handled" Armstrong, even in recovering the papers which constituted written proof of the crime, defy the credibility of Jackson's protestations of innocence.

Given the testimony of Hawkins and particularly that of Armstrong, it was reasonable for the jury to infer guilty knowledge on the part of Jackson, as she had created a cover to misrepresent the nature of the scheme, thereby demonstrating her awareness of

9

the scheme's illegality.  The evidence is also clear that Jackson shared with Emmanuel Opurum in the proceeds of the people she recruited.  Jackson had been brought into the conspiracy by Opurum, who had been introduced to the conspiracy by Oganna Obi, the mastermind of the whole scheme.  From this, the jury could reasonably conclude that Jackson was engaged in a conspiracy to defraud the United States through the making of false claims, at least with Emmanuel Opurum.  Her full knowledge of the greater background conspiracy is not necessary.  Thus, we conclude that there was sufficient evidence to convict Tonet Jackson on the conspiracy charge.

## II.  OTHER CHALLENGES TO APPELLANTS' CONVICTIONS

Having concluded that there was sufficient evidence to convict all five defendants on all counts, we turn our attention to the other assignments of error raised by various defendants.

### Improper Voir Dire

Ezinwa argues that the district court failed to conduct a proper voir dire of the jury.  Trial judges have broad discretion in conducting voir dire.  Absent an abuse of discretion and a showing that the rights of the accused have been prejudiced thereby, the scope and content of voir dire will not be disturbed on appeal.  United States v. Black, 685 F.2d 132, 134 (5th Cir. 1982).

### A.  Nigerian Nationality

Ezinwa argues that the district court abused its discretion by not thoroughly questioning the venire about prejudice against the

10

Nigerian nationality of all but one of the defendants. Prior to trial, counsel for co-defendant Okwechime submitted two questions which he requested that the district court ask the jury panel.

The two proposed questions were as follows:

> [1] Has anyone had an argument, fight, or confrontation with a Nigerian or other African which might come to light during this trial. For example, has anyone been in an automobile accident in which he or she was rear-ended and the person who rear-ended you was a Nigerian or African and got out of the car yelling and blaming you for the accident. Or has anyone been in a restaurant and had a Nigerian waiter spill hot soup over you and an argument ensued.

> [2] [H]as anyone been to Nigeria or other African country. If so, while you were there, did anything happen which would affect your judgment in this case. For example, did anyone get sick and the medical care was substandard or did you have some trouble getting in or out of Nigeria.

The district court denied Okwechime's counsel's request to pose these questions to the panel. Counsel for Okwechime objected and proffered the two questions. No other proposed questions regarding the defendants' nationality or race were proffered. We readily agree with the district court's refusal to pose either of these questions to the venire and note the court's well-stated reasons for the ruling:

> It is inconceivable to me to imagine questions that would more improperly invoke race and prejudice and bias on behalf of the jury than those questions. They are to me the most loaded questions I have ever heard observed [sic] in court . . . . And I can't imagine anything that would cause this panel to sink to a lower level of bias or antipathy . . . . I absolutely would not even begin to offer those questions to this jury (emphasis added).

Ezinwa acknowledges that these are not model questions, but he argues that they served to alert the district court to the need to

11

inquire further about the defendants' race and national origin. We disagree. The Constitution does not require questioning prospective jurors about racial or ethnic bias unless there are special circumstances. <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 190, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

The Court has indicated, however, that under its supervisory authority over the federal courts, it would require questions directed toward discovery of racial bias in some circumstances where the inquiry is not constitutionally required. <u>Ibid</u>. A refusal to honor a request for such questions is reversible error only if "there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." <u>Id</u>. at 191. The decision as to whether the total circumstances suggest such a possibility remains primarily with the trial court, subject to a case-by-case review by the courts of appeals. <u>Id.</u> at 192.

Ezinwa contends that this case involves "special circumstances" like those in <u>Ham v. South Carolina</u>, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), which required the district court to inquire about the potential jurors' racial bias. Ezinwa first urges as a special circumstance his contention that southern Texas had been flooded with fraud cases involving Nigerians, creating what counsel characterized in brief as an "apparent Nigerian penchant for fraud"[2] in the public eye. However, there is

---

[2]Counsel's use of such a characterization in his brief is incredible, considering that it is laden with the very stereotypical bias which he claims to have been wary of with the jury.

12

nothing in the record to support his contention that there is a particular public bias in southern Texas against persons of Nigerian origin which might have prejudiced the jury. Ezinwa next attempts to paint this case as one involving "special circumstances" because it involves foreign nationals accused of defrauding the U.S. government as well as U.S. citizens. The Supreme Court has stated a supervisory rule that in cases involving a defendant accused of a <u>violent</u> crime where the defendant and victim are members of different racial or ethnic groups, federal district courts must make an inquiry into racial prejudice when requested by a defendant. <u>Rosales-Lopez</u>, *supra*, 451 U.S. at 192. We reject Ezinwa's argument that this is a "special circumstances" case under <u>Rosales-Lopez</u> and <u>Ham</u>, as the defendants have not been accused of a crime of violence.

Moreover, in <u>Ham</u>, racial issues "were inextricably bound up with the conduct of the trial," <u>Rosales-Lopez</u>, 451 U.S. 182, 189, 101 S.Ct. 1629, 1635, because the defendant's defense was that he had been framed because of civil rights activities in which he had engaged. In this case, there is no allegation that matters at issue in the trial involved allegations of racial or ethnic prejudice. We also note that in <u>Ham</u>, the proposed inquiries pertaining to racial bias, which the trial court had rejected, were very simple, basic questions of whether the venire was prejudiced and were not "loaded questions" which would <u>promote</u> bias and prejudice. In the instant case, the trial judge properly rejected the proposed questions. There is nothing in <u>Ham</u> or its progeny to

13

suggest that the trial judge had a further duty to formulate his own questions on racial bias or prejudice.

Moreover, we note that although the trial court did not question the venire about their possible prejudice toward foreigners or those of differing races, he did carefully admonish the jury not to take into consideration the defendants' race, nationality, or unusual-sounding names.

## B.  *Pretrial Publicity*

Ezinwa also alleges that the district court did not inquire of the venire concerning pretrial publicity, thereby committing reversible error.  He asserts that the district court asked only about the media coverage that the attorneys involved in the case had received and never questioned jurors about media coverage of the case itself.  However, the trial transcript reflects that the judge did make the following inquiries:

> Is there anyone among you who has any personal knowledge of any such alleged occurrence involving these defendants in this case?
>
> Is there anyone among you who has been exposed to any media coverage on this or any similar case, the effect of that media coverage being to in any way diminish, impede, reduce or otherwise affect your judgment or your perceptions or your fairness or impartiality for these parties in this case?  Good.

The record is completely devoid of any evidence of pretrial publicity.  On appeal, Ezinwa appends to his brief a single Houston newspaper article which discusses the case and asks this Court to take judicial notice of the article.  This constitutes an impermissible attempt to supplement the record on appeal.  Neither this article nor any other evidence of pretrial publicity was

14

presented to the district court. Accordingly, we will not consider the article in assessing the adequacy of the voir dire. *See Ham v. South Carolina, supra, 409 U.S. at 528.*

We conclude that the above questions which the district court posed to the jury venire were adequate to discover whether any of the jurors had been biased by pretrial publicity.[3] Ezinwa's claim of error is groundless.

We find no abuse of discretion in the district court's conduct of voir dire.

### Evidentiary Rulings

Appellants challenge several of the district court's evidentiary rulings. The decision whether to admit testimony or other evidence is left to the sound discretion of the trial judge and will not be overturned absent clear abuse, *United States v. Stouffer*, 986 F.2d 916, 924 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 115 (1993), which resulted in the deprivation of some substantial right of a party. *United States v. Wicker*, 933 F.2d 284, 289 (5th Cir. 1991).

### A. Agent Taylor's Testimony

---

[3]The second inquiry posed by the judge is actually a compound question: the judge asked if the jurors had been exposed to media coverage of the case, the effect of which would affect their judgment or impartiality. It would have been preferable for the judge to have asked first whether any of the venire had been exposed to any media coverage. Then, if any had responded affirmatively, the judge could have questioned them individually about the effect the publicity might have had. However, we conclude that the second question, as posed, was an adequate attempt to identify jurors who had been affected by pretrial publicity.

15

*At trial, the government presented the testimony of Special Agent Taylor as a summary witness. Okoronkwo and Okwechime argue that his testimony was inadmissible hearsay because it was based on out-of-court statements made to him by taxpayers and other agents, being offered to prove the truth of the statements.[4] See Fed. R. Evid. 801(c).*

*The government contends that any error in the admission of the testimony at issue was harmless. We agree. Agent Taylor's testimony was merely cumulative of substantial evidence establishing the various defendants' participation in the conspiracy. In reviewing defendants' sufficiency of the evidence challenges, we have not relied upon Taylor's testimony. The district court did not commit reversible error.*

B. *Exclusion of Okwechime's Exhibit*

*Okwechime contends that the district court erred in refusing to admit a handwriting sample of Nzurum's boyfriend as an exhibit and refusing to allow a handwriting expert to testify as to the handwriting on that sample. Counsel for Okwechime first sought to introduce the exhibit during cross-examination of Nzurum. However, a review of the trial transcript reveals that counsel did not lay the proper foundation for introducing the exhibit. He merely asked the witness to look at the document, then immediately launched into questioning Nzurum about whether she could identify the writing*

---

[4]Okwechime also argues that Taylor's testimony should have been excluded because it was based on an illegal wiretap. Because we conclude that any error in the admission of Agent Taylor's testimony was harmless, we do not reach the hearsay or illegal wiretap issues.

*thereon as her boyfriend's handwriting. The prosecution objected on the basis of improper foundation, and the trial court properly sustained the objection. At that point, counsel for Okwechime totally abandoned his attempt to introduce the exhibit into evidence by laying the proper foundation and instead proceeded to the next exhibit. The district court's ruling was correct.[5]*

*Okwechime later attempted to have the handwriting expert testify as to the handwriting on the proposed exhibit. At sidebar, the judge again reiterated that he would not allow the document to be used to interrogate a witness until a proper foundation was laid. The prosecution argued at sidebar that the document constituted hearsay, and the judge did imply at that point that the document was hearsay. Okwechime argues in brief that the exhibit was not hearsay because it was not offered to prove the truth of any information contained therein. Okwechime explains in brief that he was merely trying to show that handwriting on Nzurum's return was her boyfriend's handwriting, suggesting that he had prepared the false return. However, Okwechime's counsel did not give any explanation in this regard to the court. The district court did not err in refusing to allow the handwriting expert to be questioned about the document, as it was not in evidence and its relevance was not revealed to the court.*

<em>Other Assignments of Error</em>

---

[5]Okwechime has briefed the admissibility of the exhibit from the standpoint of whether it was hearsay. However, as explained above, the document was not excluded because it was characterized as inadmissible hearsay but instead because counsel did not lay the proper foundation.

17

*A. Limiting cross-examination and rebuking counsel*

*Okwechime also argues that the district court prejudiced him by repeatedly cutting short his cross-examination of Bibian Nzurum. We have carefully reviewed the exchanges between counsel and the court and conclude that the court only interjected when the questioning became repetitive or wandered outside the bounds of relevancy, or when counsel referred to the parties by their first names, rather than by their surnames, as is more in keeping with proper courtroom decorum and procedure. The district court did not abuse his discretion in this regard, nor in any other of his comments directed toward Okwechime's counsel. Moreover, Okwechime has not made a showing, nor did he make a proffer at trial, as to what evidence he was prevented from eliciting.*

*Okwechime contends that the court poisoned the jury against him by threatening to throw his lawyer in jail for talking back on one occasion when the court interrupted counsel for asking questions that had already been asked and answered. We have considered the comments in the context of the trial as a whole. While we do not wish to encourage a practice of making such heavy-handed remarks to counsel in the presence of the jury, we do not find the court's comments to be reversible error under the circumstances of this case. As the government correctly points out, this was a single, isolated occurrence within a four-day trial. Moreover, the judge carefully instructed the jury that they should not read anything into his admonitions of people, and that his actions were irrelevant to their work in deciding the case. At*

18

*the end of the case, the judge reiterated to the jury that they should not read anything into it if he had admonished any of the attorneys. We find no reversible error. See United States v. Morales, 868 F.2d 1562, 1576-77 (11th Cir. 1989).*

*B. Limiting time for Closing Arguments*

*Eke contends that the district court placed very short time limits on closing arguments, giving the government forty minutes and the defendants as a group sixty minutes.[6] Eke's attorney was given fourteen minutes to present a closing argument. He objected and made a proffer of the issues he wanted to discuss in closing argument. Eke alleges violations of his Fifth Amendment due process rights and his Sixth Amendment right to effective assistance of counsel because he was not fully able to present his case to the jury.*

*The time allowed for closing arguments ordinarily lies within the discretion of the district court. United States v. Moye, 951 F.2d 59, 63 (5th Cir. 1992). Eke argues that fourteen minutes clearly amounted to an abuse of discretion. The government contends that fourteen minutes was sufficient time in this case, as Eke was only charged with one conspiracy count, and most of the government's witnesses did not pertain to him.*

---

[6]Tonet Jackson and Emmanuel Ezinwa attempt to adopt this argument by incorporating the arguments of all other co-defendants by reference. However, because neither has briefed the issue, nor did counsel make a proffer at trial of what issues they would have liked to discuss had they been given a longer amount of time, it is impossible to determine whether these defendants were given a sufficient amount of time to present their closing arguments.

*Recently, this Court has upheld time limits of ten minutes,*
*id., and twenty-two minutes, United States v. Leal, 30 F.3d 577,*
*586 (5th Cir. 1994). However, in a case such as this involving*
*multiple defendants charged on multiple counts in a complicated*
*conspiracy, we must carefully examine whether the time allotted was*
*adequate in light of the complexity of the case and not rely upon*
*a cursory comparison of time limitations that we have upheld in*
*other cases.*

*In United States v. Bednar, 728 F.2d 1043 (8th Cir. 1984), our*
*colleagues of the Eighth Circuit upheld a twenty minute limit given*
*to a criminal defendant in a case involving multiple counts of*
*perjury and one count involving a violation of securities law, an*
*indisputably complicated area of law. In United States v. Fesler,*
*781 F.2d 384 (5th Cir.), cert. denied, 476 U.S. 1118 (1986), we*
*upheld an allocation of 22.5 minutes per defendant in a two-*
*defendant case involving charges of involuntary manslaughter and*
*child abuse.*

*In the instant case, in analyzing whether Eke was allotted*
*sufficient time in which to present his closing argument in light*
*of the complexity of the case, we note in particular that none of*
*the defendants, Eke included, seriously challenged the existence of*
*the conspiracy or the falsity of the returns. A substantial*
*portion of the government's effort was expended in proving up its*
*case on these points, and yet none of the defendants had to devote*
*any time in closing to challenging these elements of the case.*
*Thus, each defendant was totally free to focus in closing argument*

20

*on distancing himself/herself from the admitted conspiracy, rather than being bogged down in the process of trying to challenge its existence. This is especially true of Eke, who was charged only on the conspiracy count. Thus, we do not find that the district court abused its discretion in limiting Eke's time for closing arguments to fourteen minutes. While we conclude that in this case Eke was given adequate time, we do not wish to underestimate the value of closing argument, as it is the last impression a defendant makes upon the jury. We want to make it clear that in multiple-count, multiple-defendant criminal cases tried en masse, especially those involving complex factual scenarios, trial courts should be mindful that each defendant should be given adequate time in closing argument to mete out the evidence and issues particular to that defendant and individualize his/her defense to the jury.*

## *C. Improper Recusal*

*After trial, and immediately before sentencing, Judge Kent, the trial judge, allegedly received a death threat from Eke and recused himself from the entire case. Okoronkwo argues that this across-the-board recusal was improper and that it prejudiced him because the new judge, Judge Rosenthal, gave him a harsher sentence than he thought he was going to get from Judge Kent.*

*We review Judge Kent's decision to recuse himself only for abuse of discretion. United States v. MMR Corp., 954 F.2d 1040, 1044 (5th Cir. 1992). Judge Kent explained that he was recusing himself because he could no longer "render adequate due process protections to the defendants, many of whom are Nigerian nationals*

21

. . . [and] to avoid even the appearance of impropriety which might occur at sentencing by me . . . ." We find no abuse of discretion.

Okoronkwo also contends that Judge Kent promised that his sentence would run concurrent with a pre-existing sentence. However, Okoronkwo did not raise this claim at sentencing before Judge Rosenthal. Thus, he will have to prove plain error. Judge Kent made the statement in question in the midst of arranging for Okoronkwo to begin serving a prior sentence. He stated that "I would assume that any sentence I give him will run concurrently with that, if it's a Federal prosecution." This hardly qualifies as a promise; it is merely an assumption made by the court in passing. There is no plain error.

D.  Sentencing

1.  Ezinwa's arguments

Ezinwa argues that the district court erred by not redacting disputed factual allegations in the presentence report. However, the district court formally stated during sentencing that she had not factored the disputed facts into the sentence and ordered a copy of the sentencing transcript to accompany the presentence report made available to the Bureau of Prisons. As the government correctly argues, the district court did exactly what Fed. R. Crim. P. 32(c)(3)(D) requires. There was no error.

Ezinwa also argues that the court erred when it based his sentence on 75% of the returns filed through Tax Sense.[7] Ezinwa contends that the returns filed by other conspirators were not

_____

[7] See U.S.S.G. § 2F1.1 and § 2F1.1(b)(1).

22

within his conspiratorial agreement with Obi.  Ezinwa argues that the date he entered into the conspiracy was uncertain, making the loss that was reasonably foreseeable also uncertain.

The Government responds that there was substantial evidence to indicate that Ezinwa joined Obi early on and that he had a central role in the conspiracy.  It points out that Ezinwa does not produce any evidence suggesting that he was a late-comer to the scheme; instead Ezinwa merely denies the extent of his involvement.  The PSR recommended that Ezinwa be held responsible for 90% of the loss.  We find no error here.

2.  Eke's arguments

Eke argues that his Eighth Amendment rights were violated when he was given a longer sentence than his co-conspirators.  He claims that he was treated more harshly because he allegedly made death threats against both the trial judge and the sentencing judge.  Eke also contends that Judge Rosenthal, the sentencing judge, should have recused herself in his case because of the alleged death threats.  We find no abuse of discretion in Judge Rosenthal's decision not to recuse herself.  The court specifically noted that she did not rely on or consider any of the information about the alleged death threats in determining the applicable guideline sentence for Eke.  The government correctly points out that two objective facts account for the difference in Eke's sentence:  (1) Eke received a two-level increase for obstruction of justice,

23

stemming from an attempt to suborn perjury[8]; and (2) Eke had several prior convictions that put him in a higher criminal history category than his co-conspirators.

<u>CONCLUSION</u>

For the foregoing reasons, we AFFIRM.

---

[8]*See* U.S.S.G. § 3C 1.1.