**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

HENRY ANEKWU,
  *Defendant-Appellant.*

No. 10-50328

D.C. No.
2:03-cr-01151-
JFW-1

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
February 8, 2012—Pasadena, California

Filed September 20, 2012

Before: Dorothy W. Nelson, Diarmuid F. O'Scannlain, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

11489

## COUNSEL

Alexandra Wallace Yates, Federal Public Defender, Los Angeles, California, for defendant-appellant Henry Anekwu.

Ellyn Marcus Lindsay, Assistant U.S. Attorney, Los Angeles, California, for plaintiff-appellee United States of America.

## OPINION

N.R. SMITH, Circuit Judge:

Appellant Henry Anekwu (Anekwu) appeals his conviction and sentence for multiple counts of mail fraud, wire fraud, and telemarketing fraud against the elderly in violation of 18 U.S.C. §§ 1341, 1343, 2326(1). On appeal, Anekwu argues that numerous procedural and substantive errors occurred during his trial, requiring a new trial. Anekwu also argues that his sentence is unreasonable and re-sentencing is necessary. We have jurisdiction pursuant to 18 U.S.C. § 1291, and we affirm.

The primary question raised on appeal is whether the district court committed plain error by admitting certificates of authentication for foreign public and business records by means of affidavit in violation of the Confrontation Clause. We conclude that it did not.

The Supreme Court has not specifically addressed whether admitting certificates of authentication for documents violates

a defendant's Confrontation Clause rights. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 336-37 (2009) (Kennedy, J., dissenting). We have not previously dealt with the issue of whether certifications of foreign public records are "testimonial," making the custodians who created the certifications "witnesses" subject to the defendant's Sixth Amendment right of confrontation. However, we have concluded that routine certifications of domestic public records are not testimonial. *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005). We have not addressed whether certificates of authenticity for business records are testimonial. Because there is no controlling authority on point, and because our cases indicate that the admission of the certificates of authentication did not violate the Confrontation Clause, we cannot conclude here that the district court plainly erred.

Additionally, we cannot conclude that the district court abused its discretion in (1) conducting voir dire, (2) admitting both a chart summarizing bank records and the underlying records into evidence, or (3) refusing to give the defendant's requested informant credibility instruction to the jury. We also cannot conclude that the district court plainly erred in (1) admitting allegedly improper comments by the prosecutor in closing argument, or (2) re-reading the original jury instructions in response to a question posed by the jury. Because we do not find any error, there can be no cumulative error.

Finally, the district court did not plainly err in (1) referencing the defendant's inability to pay restitution to show that it had considered imposing a lesser sentence to facilitate the payment of restitution, or (2) using two Guidelines ranges.

# I.

On November 12, 2003, a federal grand jury in the United States District Court for the Central District of California charged Henry Anekwu with numerous counts of mail fraud and telemarketing fraud against the elderly in violation of 18

U.S.C. §§ 1341, 1343, and 2326. The Government alleged that, between 1998 and 2002, Anekwu owned and operated lottery companies in Canada. Two relevant companies were Platinum Award, Inc. ("Platinum") and Capital Award, Inc. ("Capital"). The Government also alleged that Anekwu and his companies targeted elderly victims in the United States, particularly in California. According to the Government, Anekwu caused telemarketers to call victims and falsely represent that they had won lottery money, forcing them to pay certain taxes and costs to Anekwu and his companies in order to receive their money. The alleged victims were then told to mail payments to the lottery companies at various commercial mailbox addresses in Vancouver, Canada.

Anekwu was extradited to the United States and made his initial court appearance on December 24, 2009. Anekwu's jury trial lasted three days. The jury found Anekwu guilty of sixteen counts of mail fraud committed in connection with telemarketing. On July 12, 2010, the district court sentenced Anekwu to 108 months in prison and ordered a restitution payment of $510,840.75. Anekwu filed a timely Notice of Appeal.

## II.

As part of the Government's case against Anekwu, the Government sought to introduce foreign business and public records pursuant to 18 U.S.C. § 3505 and Federal Rules of Evidence 803 and 902. The records consisted of incorporation records for Capital and Platinum, Canadian bank records, and mailbox applications, linked to Anekwu.

To comply with 18 U.S.C. § 3505 and the Federal Rules of Evidence, the Government obtained certifications signed by the respective record-keepers in Canada. The certifications for the bank records and the mailbox applications set forth the facts required by § 3505. The certifications for the documents of incorporation state, for example:

> *I Hereby Certify that* the documents annexed hereto and impressed with my Seal of Office and relating to **CAPITAL AWARD INC.**, which was dissolved under section 257 of the *Company Act* on June 14, 2002, are true copies of the public documents whereof they purport to be copies, and that I am the proper custodian of the said documents.

Anekwu filed a motion in limine, objecting to the admission of the incorporation records and the mailbox records. He argued that the foreign records were inadmissible hearsay and did not meet the requirements of 18 U.S.C. § 3505, because they were not trustworthy. The Government responded that the requirements of § 3505 were met, and the records were admissible through signed certificates of authentication by the custodians of the records (compliant with § 3505) with no need of an authenticating witness. The Government never suggested that the record-keepers were unavailable. Anekwu did not dispute that the records were what they purported to be.

The district court denied Anekwu's motion and admitted the records and certifications into evidence. At the hearing on the matter, Anekwu's counsel stated that she did not object to the authentication (based on the certificates of authentication) of the mailbox applications, but instead she argued that the source of the information or method of preparation lacked trustworthiness. The court ruled that the mailbox applications had "the requisite trustworthiness because they each contain the driver's license with a picture of the defendant, and for that reason [it] . . . den[ied] the motion in limine with respect to the mailbox applications." As for the incorporation documents, the court ruled that the certificates of incorporation were admissible as public records and the other incorporation documents were admissible as defendant's own statements under Federal Rule of Evidence 801(d)(2)(A), and as statements of a co-conspirator Emeka Ofor under Federal Rule of Evidence 801(d)(2)(E).

**A.**

Anekwu argues that the district court violated his Confrontation Clause rights by admitting evidence of foreign documents by means of written affidavit. We normally review whether evidence was admitted in violation of the Confrontation Clause de novo. *United States v. Hagege*, 437 F.3d 943, 956 (9th Cir. 2006). However, "[i]f the defendant failed to object to the admission of evidence under the Confrontation Clause, we review for plain error." *Id.* Plain error occurs when "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Wright*, 625 F.3d 583, 607-08 (9th Cir. 2010) (internal quotation marks omitted). "To be plain, the error must be clear or obvious, and an error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011) (internal quotation marks omitted).

Here, Anekwu failed to object to the admission of the foreign records under the Confrontation Clause. Rather, Anekwu objected to the admission of the foreign records on hearsay grounds. While the Government stated in its response that the admission of records, without an authenticating witness, "does not violate the Confrontation Clause," that brief statement by the Government does not substitute for a timely and specific Confrontation Clause objection by Anekwu. *See United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989) (recognizing that the "pointless formality" exception—"[a] party need not properly object if doing so would be a 'pointless formality' "—is the "sole exception to the requirement of a formal, timely, and distinctly stated objection"). Thus, plain error review of Anekwu's Confrontation Clause claim is

appropriate. *See United States v. Huber*, 772 F.2d 585, 588 (9th Cir. 1985) (stating that where a defendant "objected on hearsay grounds, [but] failed to make a [C]onfrontation [C]lause objection at trial," the court could review the defendant's Confrontation Clause claims "under the plain error doctrine, [despite] the lack of a timely and specific objection before the district court . . . .").

## B.

**[1]** We cannot conclude that the district court plainly erred in admitting certificates of authentication for foreign public and business records into evidence. "The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (alterations in original) (citation omitted). The Confrontation Clause "guarantees a defendant's right to confront those who 'bear testimony' against him. A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Id.* (internal quotation marks and citation omitted). "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2714 n.6 (2011) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

The "core class of testimonial statements" identified by the Supreme Court includes: (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions,

prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) (internal quotation marks and citations omitted).

In *Melendez-Diaz*, the Supreme Court decided that "certificates of analysis," showing the results of forensic analysis performed on a seized substance that turned out to be cocaine, were testimonial "affidavits 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " 557 U.S. at 311 (quoting *Crawford*, 541 U.S. at 52). Similarly, in *Bullcoming* the Supreme Court decided that a certified blood-alcohol forensic report was testimonial in character. 131 S. Ct. at 2714-15. *Melendez-Diaz* and *Bullcoming* stand for the proposition that "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming*, 128 S. Ct. at 2717.

**[2]** However, the Supreme Court has not specifically addressed whether "[t]he long-accepted practice of authenticating copies of documents by means of a certificate from the document's custodian stating the copy is accurate" violates the Confrontation Clause. *Melendez-Diaz*, 557 U.S. 305, 336-37 (Kennedy, J., dissenting). The Supreme Court in *Melendez-Diaz* did state that "[a] clerk could by affidavit *authenticate* or provide a copy of an otherwise admissible record, but could not . . . *create* a record for the sole purpose of providing evidence against a defendant." *Id.* at 322-23 (majority opinion). Additionally, a clerk could "certify to the correctness of a copy of a record kept in his office, but had no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect." *Id.* at 322 (internal quotation marks omitted).

## C.

**[3]** We have previously concluded that "a routine certification by the custodian of a domestic public record . . . and a routine attestation to authority and signature . . . are not testimonial in nature." *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (citing *United States v. Rueda-Rivera*, 396 F.3d 678, 680 (5th Cir. 2005) (per curiam)).

**[4]** Here, the incorporation documents are foreign public records. The certificates of the incorporation documents certify that the documents are true copies and that the person certifying the documents is the custodian. The certificates name the company and the date dissolved in order to specify the company to which the certificate applies. This information does not interpret what the records contain or certify their substance or effect. The certificates do not "*create* a record for the sole purpose of providing evidence against a defendant." *Melendez-Diaz*, 557 U.S. at 323. *Weiland* seems to indicate that a routine certification by the custodian of a foreign public record would not be testimonial in nature. If so, the certificates for the incorporation documents would not violate the Confrontation Clause. Thus, we cannot conclude that the district court plainly erred by admitting the certificates for the incorporation documents.[1]

---

[1]Our recent decision in *United States v. Bustamante*, ___ F.3d ___, 2012 WL 3181269 (9th Cir. Aug. 7, 2012), does not impact this determination. In *Bustamante*, the Government introduced into evidence several documents to prove that the defendant Bustamante was born in the Philippines and is not a United States citizen. *Id.* at \*1. One of the documents, Exhibit 1, "purported to be a 'copy' of Bustamante's Philippine birth certificate." *Id.* Exhibit 1 was obtained by the Government as part of an earlier Government investigation into Bustamante's citizenship. *Id.* The document was not a photocopy or duplicate. *Id.* Exhibit 1 stated that: "This is to certify that according to the record of births in this office, the following is the copy of the birth certificate of: Napoleon Bustamante." *Id.* It then transcribed the information contained in the office's birth records regarding Bustamante, including his birth in the Philippines in 1939. *Id.*

Anekwu argues that the statements in *Melendez-Diaz* regarding a clerk's authentication were dicta. We have "described discussions that are unnecessary to a decision as dicta." *Barapind v. Enomoto*, 400 F.3d 744, 759 (9th Cir. 2005) (en banc) (per curiam). In *Melendez-Diaz*, the Government argued that the certificates of analysis were admissible because they were akin to business and public records. 557

---

The document stated that it was issued in 1975, and was signed by a civil registrar. *Id.*

On appeal, we concluded that "Exhibit 1 is a testimonial statement," and that its admission "violated Bustamante's confrontation rights because Bustamante did not have a prior opportunity to examine" the civil registrar. *Id.* at *3. "In essence, Exhibit 1 is an affidavit testifying to the contents of the [Philippine] birth records . . . and is 'functionally identical to [the] live, in-court testimony' that an employee of the Civil Registrar's office might have provided." *Id.* (quoting *Melendez-Diaz*, 557 U.S. at 310-11). "It was also created for the purpose of the [earlier Government] investigation into Bustamante's citizenship and was 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id.* (quoting *Melendez-Diaz*, 557 U.S. at 310).

While we acknowledged that birth certificates and official copies of them are non-testimonial public records, we emphasized that "Exhibit 1 is not a copy or duplicate of a birth certificate." *Id.* at *4. Instead, Exhibit 1 was "quite plainly an affidavit." *Id.* (internal quotation marks omitted). "It is a typewritten document in which [the civil registrar] testifies that he has gone to the birth records . . . , looked up the information on Napoleon Bustamante, and summarized that information at the request of the U.S. government for the purpose of its investigation into Bustamante's citizenship." *Id.* "Rather than simply authenticating an existing non-testimonial record, [the civil registrar] created a new record for the purpose of providing evidence against Bustamante." *Id.*

The certificates of authentication for the incorporation documents in this case are distinguishable from Exhibit 1 in *Bustamante*. While the civil registrar in *Bustamante* "created a new record for the purpose of providing evidence against Bustamante," the custodian here "simply autheticat[ed] . . . existing non-testimonial record[s]." *See id.* Thus, we cannot conclude that *Bustamante* means that the district court in this case plainly erred by admitting the certificates for the incorporation documents.

U.S. at 321. To rebut that argument, the Supreme Court had to clarify the clerk's authentication issue. Thus, the statements in *Melendez-Diaz* were not dicta, because they were not unnecessary to the decision.

Anekwu also argues that *Melendez-Diaz* and *Bullcoming* abrogated our conclusion in *Weiland*. However, *Melendez-Diaz* and *Bullcoming* dealt with certificates from personnel who specifically performed tests to be used as evidence at trial, rather than an authenticating certificate from a custodian as seen in *Weiland*. *Melendez-Diaz* further stated that clerks may authenticate public records, which supports the conclusion in *Weiland*. Thus, the Supreme Court has not abrogated *Weiland*.

## D.

**[5]** Whether certifications of business records violate the Confrontation Clause is an issue of first impression for this Court. *See, e.g.*, *Weiland*, 420 F.3d at 1076 n.13 ("[W]e need express no opinion on whether the Confrontation Clause requires the government to make the custodian of business records available for cross-examination.").

After the Supreme Court decided *Melendez-Diaz* and *Bullcoming*, the Tenth Circuit addressed this very issue in *United States v. Yeley-Davis*, 632 F.3d 673 (10th Cir.), *cert. denied*, 131 S. Ct. 2712 (2011). In *Yeley-Davis*, the Tenth Circuit dealt with certificates of authentication of cell phone records. *Id.* at 680. The Tenth Circuit held that "certificates of authenticity presented under [Federal Rule of Evidence] 902(11) are not testimonial." *Id.* (citing *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006)). "Because the phone records here were 'created for the administration of [Verizon's] affairs and not for the purpose of establishing or proving some fact at trial' we conclude that they were not testimonial and thus, not subject to confrontation." *Id.* at 679 (quoting *Melendez-Diaz*, 557 U.S. at 324). The Tenth Circuit invoked the Supreme

Court's distinction "between affidavits created to provide evidence against a defendant and an affidavit created to authenticate an admissible record." *Id.* at 680 (citing *Melendez-Diaz*, 557 U.S. at 322-23).

**[6]** Federal Rule of Evidence 902(11) provides that domestic records that meet the requirements of Rule 803(6)(A)-(C), as shown by the certification of a custodian, are self-authenticating. Similarly, 18 U.S.C. § 3505 provides that, to authenticate foreign business records, the custodian of the record must attest that:

> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
>
> (B) such record was kept in the course of a regularly conducted business activity;
>
> (C) the business activity made such a record as a regular practice; and
>
> (D) if such record is not the original, such record is a duplicate of the original . . . .

18 U.S.C. § 3505(a)(1). These requirements are substantially similar to the requirements of Federal Rules of Evidence 803(6) and 902(11). Without any controlling authority on point, it is arguable that certificates of authentication for foreign records presented under 18 U.S.C. § 3505(a)(1) are analogous to certificates of authentication for domestic records presented under Federal Rules of Evidence 803(6) and 902(11).

**[7]** Here, the certifications of the foreign business records (mailbox applications and bank records) stated that the records were: (1) created at or near the time of the events they

purported to establish, by someone with knowledge of those events; (2) kept in the course of regularly conducted business; (3) made as part of that business's regular practice; and (4) true and correct copies. The certificates satisfy the requirements of 18 U.S.C. § 3505(a)(1) in substance. *See United States v. Jawara*, 474 F.3d 565, 584 (9th Cir. 2007). Following the reasoning of *Yeley-Davis*, the certificates authenticated otherwise admissible records. *See Melendez-Diaz*, 557 U.S. at 324. If so, then the admission of the authenticating certificates for the mailbox applications and bank records would not have violated the Confrontation Clause. Thus, we cannot conclude that the district court plainly erred by admitting the certificates for the foreign business records.

Anekwu argues that the certificates are testimonial affidavits used as "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact." *Id.* at 310 (internal quotation marks omitted). However, "the purpose of the certificates here was merely to authenticate the . . . records —and not to establish or prove some fact at trial . . . ." *Yeley-Davis,* 632 F.3d at 680.

Anekwu also argues that the certificates are testimonial, because they are similar to certificates of the nonexistence of a record, since they are the result of the examination of records. However, a certificate of nonexistence of records is testimonial, because it is "substantive evidence against the defendant whose guilt depend[s] on the nonexistence of the record for which the clerk searched." *Melendez-Diaz*, 557 U.S. at 323. The certifications of the mailbox applications and bank records were not substantive evidence against Anekwu. Rather, they were used to authenticate records.

Finally, Anekwu argues that the certificates are "representations, relating to past events and human actions not revealed in raw, machine-produced data, . . . meet for cross-examination." *Bullcoming*, 131 S. Ct. at 2714. However, in *Bullcoming*, the analyst certified to more than the legal

requirements for authenticating a record created for an administrative purpose. Unlike the custodian here, the analyst in *Bullcoming* certified to the procedures used in a test specifically done to establish or prove past events relevant to a criminal prosecution. *See id.* at 2713, 2714 n.6.

**[8]** In sum, we cannot conclude that the district court plainly erred in admitting the certificates of authentication for the foreign public and business records into evidence.

## III.

Anekwu's defense counsel asked for, but was denied, attorney-conducted voir dire. The district court, however, invited the parties to submit potential voir dire questions. Because of Anekwu's race and ethnicity (black and Nigerian), defense counsel proposed the following questions:

> 41. Do you think individuals of certain racial or ethnic backgrounds are more likely to commit crimes than others?

> 42. Do you have any assumptions, opinions, or feelings about Henry Anekwu based on his race or nationality?

> 43. Does Mr. Anekwu's race/nationality affect your ability to be fair or impartial to him in any way?

> 44. The indictment alleges that the charges took place in and from Canada. Do you have any opinions or feelings about this any way or the other?

The district court rejected all of these questions, because the court was worried that the questions would prompt the jurors to learn Anekwu is Nigerian, which Anekwu told the court he did not want the jurors to know. The Government indicated that Anekwu's Nigerian nationality may be brought

up during trial. Anekwu did not object to the Government's response or the court's proposed questionnaire. The judge replaced Anekwu's proposed questions with one question: "Are you a member of a club, organization or association that by policy or practice has ever been prohibited or limited its membership on the basis of race, color, religion, sexual orientation, gender, disability or national origin?" The court also asked: "Do you know of any reason at all as to why you cannot be a completely fair and impartial juror in this case?"

On appeal Anekwu cited multiple news articles and cases suggesting this type of fraud is often perpetrated by Nigerians. During trial, the jury learned that Anekwu is Nigerian and that another Nigerian man, Wilson Okkiki, had been convicted of telemarketing fraud targeting Americans.

## A.

Anekwu argues that the district court erred by rejecting his proposed voir dire questions. Anekwu did not waive his right to appeal the voir dire questions, because he raised the issue before the district court by submitting proposed voir dire questions on race and nationality. *Cf. United States v. Gay*, 967 F.2d 322, 325 (9th Cir. 1992).

We review "[t]he sufficiency of voir dire questions asked by the trial court . . . for abuse of discretion." *United States v. Payne*, 944 F.2d 1458, 1474 (9th Cir. 1991). An abuse of discretion occurs (a) if the district court makes a legal error by identifying the incorrect legal rule or (b) if the district court's application of the correct legal standard was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (internal quotation marks omitted). "While it is an abuse of discretion to fail to ask questions reasonably sufficient to test jurors for bias or partiality, the trial court may refuse questions which are 'tied to prejudice only speculatively.' "

*Payne*, 944 F.2d at 1474 (quoting *United States v. Jones*, 722 F.2d 528, 529 (9th Cir. 1983)).

**B.**

Voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). "[F]ederal judges have been accorded ample discretion in determining how best to conduct" voir dire. *Id.* at 189.

**[9]** "[T]he Constitution requires a question on racial [or ethnic] prejudice" in voir dire when racial or ethnic issues are "inextricably bound up with the conduct of the trial . . . ." *Id.* However, "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." *Id.* at 190. "Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." *Id.*

In addition to the constitutional requirement, based on the supervisory authority of the federal courts, inquiry into prejudice may still be required.

> [I]t is usually best to allow the defendant to . . . mak[e] the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued. Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury.

*Id.* at 191 (footnote omitted).

**[10]** Here, racial or ethnic issues were not "inextricably bound up with the conduct of the trial." *Id.* at 189. Thus, the district court had no constitutional obligation to inquire into racial or ethnic prejudice. In *Rosales-Lopez*, the Supreme Court noted that "an alleged criminal confrontation between a black assailant and a white victim" does not alone create a constitutional requirement to question the jury on racial prejudice. *Id.* at 190. Conversely, racial issues were inextricably bound up with the conduct of the trial in a case where a black defendant's defense was that law enforcement officers had framed him because of his well-known participation in civil rights activities. *Id.* at 189-90. The alleged bias of Americans against Nigerians is similar to the potential biases involved in an alleged criminal confrontation between an assailant and victim of different races. Anekwu has not alleged any defense that race or nationality caused, in any way, the charges against him. In short, Anekwu's race or nationality are not "inextricably bound up with the conduct of the trial." *See id.* at 189. Thus, we cannot conclude on this record that the district court abused its discretion in denying Anekwu's request to inquire into the jury's racial or ethnic prejudice.

## C.

**[11]** If the defendant's race or nationality are not inextricably bound up with the conduct of the trial, "[f]ailure to honor [a defendant's] request" for inquiry into the jury's racial or ethnic prejudice "will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." *Id.* at 191. We recognize "three instances in which there is a real possibility of prejudice and a consequent need for specific voir dire questioning." *United States v. Toomey*, 764 F.2d 678, 682 (9th Cir. 1985) (quoting *United States v. Jones*, 722 F.2d 528, 529-30 (9th Cir. 1983) (per curiam)). Anekwu argues that this case falls into one such instance, namely "when the case involves other matters concerning which either the local community or the population at large is

commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact . . . ." *Id.* (internal quotation marks omitted). Anekwu does not argue that the other two recognized instances apply.

Anekwu argues that the district court erred, because the American population harbors strong feelings that may skew deliberations. Alternatively, Anekwu argues that there was a potential (not speculative) source of prejudice that his questions were reasonably calculated to discover. He supports his argument that the district court abused its discretion with the following propositions: (1) Anekwu's Nigerian background would be mentioned, although it would not be the focus of the Government's case; (2) Anekwu was a black, foreign defendant accused of targeting Americans; (3) Americans commonly associate Africans or Nigerians with fraud; and (4) the court agreed that questions on potential racial bias were needed.

Based on the totality of the circumstances, we cannot conclude that the district court abused its discretion here. *See Rosales-Lopez*, 451 U.S. at 192. ("[T]he decision as to whether the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury remains primarily with the trial court, subject to case-by-case review by the appellate courts.").

First, although the district court recognized that race or ethnicity might be an issue, the district court never indicated that it perceived a risk of racial, ethnic, or national origin bias. Second, the district court asked the jurors whether there was any reason they could not be fair and impartial. "The Supreme Court has held that such questions reduce the possibility of ethnic prejudice." *United States v. Sarkisian*, 197 F.3d 966, 979 (9th Cir. 1999). Third, there is no presumption of prejudice simply because the defendant is of a different ethnic or racial background. *See Rosales-Lopez*, 451 U.S. at 190.

Fourth, Anekwu's argument that Americans associate Nigerians with fraudulent conduct is not a "*matter*[ ] concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact . . . ." *Toomey*, 764 F.2d at 682 (emphasis added). The "matters" we have so recognized include child sexual abuse, *Payne*, 944 F.2d at 1474, and the insanity defense, *United States v. Allsup*, 566 F.2d 68, 70 (9th Cir. 1977). We found that the defense of coercion was not a matter where the public is "commonly known to harbor strong feelings." *Jones*, 722 F.2d at 530. Our cases indicate that "matters" include substantive topics that many may have strong feelings about, not a general impression or prejudice against a group. Thus, whether the population at large thinks Nigerians are dishonest is not the type of matter meant by our case law.

Fifth, even if there is a harbored prejudice that Nigerians are dishonest (and it qualifies as a "matter"), the district court did not abuse its discretion by refusing to ask Anekwu's proposed questions. *See Payne*, 944 F.2d at 1474. Anekwu's Nigerian nationality, or perhaps even his continent of origin (Africa), was the characteristic allegedly creating potential prejudice, not his race. Notwithstanding, defense counsel stated that she did not want Anekwu's nationality revealed, and the district court thought the proposed questions required revelation of Anekwu's nationality. As such, the district court substituted the question asking if any juror had been involved in a group that discriminated based on nationality or race (among other things) in order to avoid disclosing nationality. After the court suggested this change, it asked counsel: "Do you agree?" Defense counsel did not object. Rather, counsel gave a vague answer indicating that she did not say that the court could not ask questions about race, but she worried about the court disclosing nationality. The district court could have reasonably interpreted the response, in the context, to be a withdrawal of the request. Further, although the Govern-

ment stated that Anekwu's nationality would likely "come up as a bit of a side issue," the district court abuses its discretion under its supervisory authority if it fails to honor the *defendant's request*. *Rosales-Lopez*, 51 U.S. at 191. Here, based on the context, defense counsel's actions are susceptible to a reasonable interpretation that she withdrew her request for questions on nationality.

**[12]** Sixth, Anekwu's Nigerian nationality, combined with the allegations that he defrauded Americans, does not create a likely source of prejudice. *See United States v. Okoronkwo*, 46 F.3d 426, 434 (5th Cir. 1995) ("[T]here is nothing in the record to support [the defendant's] contention that there is a particular public bias in southern Texas against persons of Nigerian origin which might have prejudiced the jury."). While Anekwu has offered evidence showing that the type of fraud in question here frequently comes from Nigeria, this evidence does not prove that the population at large has prejudice against Nigerians.

Lastly, the district court did not abuse its discretion by not specifically inquiring about racial prejudice, because Anekwu's race was not the characteristic that was the likely source of prejudice. When a defendant is charged with a violent crime and the victim is of a different race, then a court must inquire as to racial prejudice. *Rosales-Lopez*, 451 U.S. at 192. Otherwise, it is up to the trial court, subject to a case-by-case review of the appellate court, to decide if racial prejudice affected the jury. *Id.* Here, there is no indication that racial prejudice affected the jury.

**[13]** In sum, we cannot conclude that the district court abused its discretion when it conducted voir dire.

## IV.

Anekwu objected to the admission of a summary chart of Canadian bank records (prepared by FBI Financial Analyst

Tammy Chapman), and Ms. Chapman's testimony regarding the summary chart. Anekwu argued that the summary chart and Ms. Chapman's testimony were inadmissible under Federal Rules of Evidence 1006 and 403. Specifically, Anekwu argued that the bank records were not "voluminous" enough to qualify under Rule 1006. The Government responded that the individual bank records were voluminous enough, because the jury would have a hard time calculating the amounts going in and out of the accounts.

The district court found the bank documents too voluminous to be conveniently examined in court. The court ruled that the summary chart and the underlying bank records were admissible. The summary chart was admitted under Rules 1006 and 611(a). As for the bank records, "the bank records have additional probative value which is not captured by the summary chart." The summary chart would aid in understanding the records and the bank records would be used to indicate specific checks signed by Anekwu. Further, the district court noted that, although summary charts are usually not admitted if the underlying evidence is admitted, under Rule 611(a), the court could exercise its discretion to admit summary charts and the underlying bank records for the purpose of assisting the jury in evaluating voluminous evidence. The district court also found no risk of undue prejudice under Rule 403, especially since Anekwu did not object to the accuracy of the summary chart. Additionally, the district court gave a limiting instruction, explaining that the jury should only afford the charts and summaries the weight that they would give to the underlying materials.

## A.

Anekwu argues that the district court erred in admitting the chart summarizing the foreign bank records, because summary charts cannot be admitted as evidence if the underlying records are admitted. We review a district court's admission

of summary evidence for an abuse of discretion. *United States v. Marchini*, 797 F.2d 759, 766 (9th Cir. 1986).

**B.**

"[T]he proponent of a summary must demonstrate the admissibility of the underlying writings or records summarized, as a condition precedent to introduction of the summary into evidence under [Federal Rule of Evidence] 1006." *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir. 1979). Because we cannot conclude that the district court plainly erred in admitting the certificates authenticating the bank records, the district court did not abuse its discretion in determining that the bank records were properly authenticated and admissible.

**[14]** "Charts and summaries as evidence are governed by Federal Rule of Evidence 1006 . . . ." *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991). "In contrast, charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves." *Id.* However, we have not "articulat[ed] a bright-line rule against admission of summary charts as evidence." *United States v. Boulware*, 470 F.3d 931, 936 (9th Cir. 2006), *vacated and remanded on other grounds*, *Boulware v. United States*, 552 U.S. 421 (2008). Although "we do not approve of receiving summary exhibits of material already in evidence," we have not "reverse[d] for that reason." *Id.* We have also "elsewhere recognized a district court's discretion under [Federal Rule of Evidence] 611(a) to admit summary exhibits for the purpose of assisting the jury in evaluating voluminous evidence." *Id.*

**[15]** In *Boulware*, we saw no "need either to embrace or condemn the procedure followed in this case because, even if it were error to allow the summary exhibit into evidence, the error is harmless given admissibility of the underlying data, lack of objection to accuracy of the summary, and the limiting

instruction." *Id.* Here as well, we need not embrace or condemn the procedure followed by the district court. The bank records were admissible. Anekwu had the opportunity to cross-examine Tammy Chapman (the FBI analyst who prepared the charts), Anekwu never objected to the accuracy of the charts, and the district court gave a limiting instruction.[2] Based on those circumstances, we cannot conclude that the district court abused its discretion in admitting both the summary chart and underlying records into evidence.

## V.

The district court informed the jury that they must decide facts, which includes deciding which testimony to believe and how much of that testimony to believe (i.e., all, part, or none). The court further stated, "[i]n considering the testimony of any witness, you may take into account . . . the witness's interest in the outcome of the case and any bias or prejudice . . . ." The district court also gave the Ninth Circuit model jury instruction for an accomplice witness, because of the testimony of David Chipere (Anekwu's employee).[3]

---

[2]Further, under Federal Rule of Evidence 403, the district court did not plainly err, because admitting the charts was helpful to the jury and the underlying records were admissible. Thus, this case is not one of the rare cases where the district court should be reversed. *See United States v. Rizk*, 660 F.3d 1125, 1132 (9th Cir. 2011).

[3]The accomplice jury instruction went as follows:

> You have heard testimony from David Chipere, a witness who admitted being an accomplice to the crime charged. An accomplice is one who voluntarily and intentionally joins with another person in committing a crime.

> For this reason, in evaluating Mr. Chipere's testimony, you should consider the extent to which or whether Mr. Chipere's testimony may have been influenced by this factor. In addition, you should examine Mr. Chipere's testimony with greater caution than that of other witnesses.

*See* 9th Cir. Model Crim. Jury Instr. 4.9.

Anekwu requested that the court also give an informant credibility instruction regarding Chipere as follows:

> The testimony of an informant, someone who provides evidence against someone else for money or to escape punishment for his own misdeeds or crimes or for other personal reason or advantage, must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.
>
> David Chipere may be considered to be an informant in this case.
>
> The jury must determine whether the informer's testimony has been affected by self-interest, or by the agreement he has with the government, or by his own interest in the outcome of this case, or by prejudice against the defendant.

The Government objected, arguing that the facts did not support a conclusion that Chipere was an informant, because Chipere had not received a benefit and the accomplice instruction was adequate. Specifically, Chipere received a letter from the Government that Chipere was not a target or subject of investigation. Further, Chipere was not a target, because the statute of limitations had run.

Anekwu responded that the informant credibility instruction was required, because Chipere was motivated to testify for other personal reasons and the accomplice instruction failed to account for testimony given for self-interest. Chipere consulted with a lawyer, who presumably told him that there is no statute of limitations in Canada for the telemarketing fraud, and thus he may be testifying to gain favor with Canadian authorities. During cross-examination by the defense, Chipere's relevant testimony went as follows:

Q. [H]ave you been charged about your involve-
ment in this case in Canada?

A. No.

Q. Okay. And in Canada you can still be charged for
this, right?

A. I don't know about that.

Q. You don't know about that. Okay. You haven't
been charged in the United States for this, correct?

A. That's correct.

Q. You were never charged with this back when it
happened in 2002, 2003?

A. No.

Q. Okay. And obviously you don't want to be prose-
cuted?

A. I thought about that, that's why I'm here.

In addition to cross examining Chipere, in closing argu-
ments, the defense argued Chipere's potential bias. The dis-
trict court denied the requested informant credibility
instruction. The court "concluded that, based upon the facts of
this case, that instruction is not supported by the facts of this
case."

## A.

Because the parties dispute the factual foundation for
Anekwu's requested informant credibility instruction, we
review the district court's refusal to give the requested jury
instruction for an abuse of discretion. *United States v.*

*Holmes*, 229 F.3d 782, 786 (9th Cir. 2000); *United States v. Duran*, 59 F.3d 938, 941 (9th Cir. 1995).

## B.

"The courts have long recognized that the definition of an informer includes persons who provide evidence against a defendant for some personal advantage or vindication, as well as for pay or immunity." *Guam v. Dela Rosa*, 644 F.2d 1257, 1259 (9th Cir. 1980). In *Dela Rosa*, testimony by a police lieutenant "undisputably show[ed] that [an informant's] testimony was secured by a promise not to prosecute him in exchange for his cooperation." *Id.* We decided that "this promise could be construed as a form of 'immunity;' " if not, then "the promise must be construed as securing [the informant] a very significant personal advantage." *Id.* Thus, we found that the failure to give the informer instruction required reversal. *Id.* at 1260.

Conversely, in *United States v. Monzon-Valenzuela*, we found that the district court did not plainly err in not giving an informant credibility instruction, because it was not clear that the witness was an informant. 186 F.3d 1181, 1182-83 (9th Cir. 1999). The witness's motivation for testifying was unclear. *Id.* at 1183. Although the witness gathered information while undercover for the government, the witness denied receiving or expecting any benefit for his testimony. *Id.* However, the witness also admitted that he had previously traded information for leniency and would not testify against another "unless 'its [sic] going to do you some good.' " *Id.* The witness was never asked to explain his motivation. *Id.*

This case falls somewhere in between *Dela Rosa* and *Monzon-Valenzuela*. On the one hand, the authorities never promised any advantage to Chipere. On the other hand, Chipere stated that he was testifying, because he did not want to be prosecuted.

But even if we accept Anekwu's characterization of Chipere as an informant, "there is no error where . . . the other instructions in their entirety covered the defense theory." *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1574 (9th Cir. 1989).

> [T]here is no significant distinction between a cautionary instruction on the testimony of an accomplice and a cautionary instruction on one granted immunity. In both instances, the jury is instructed that the testimony "be received with caution and weighed with care." Consequently, whether we treat the government witnesses as accomplices or as persons granted immunity, or both, is immaterial because the instruction would be essentially the same. . . . In any event, we are unable to detect any prejudice as the appellant was allowed to fully develop the immunity issue on cross-examination and forcefully argue it in summation.

*United States v. Morgan*, 555 F.2d 238, 243 (9th Cir. 1977).

**[16]** Here, we cannot conclude that the district court abused its discretion. The district court gave the accomplice instruction warning jurors to be cautious of Chipere's testimony. Anekwu cross-examined Chipere regarding his potential charges and motivation and argued his potential bias in closing argument. Further, Anekwu argues that Chipere sought to prevent prosecution, because he potentially faced prosecution through his role as an *accomplice*. Because of the accomplice instruction, the cross-examination, and the closing arguments, Anekwu was "allowed to fully develop the [informant credibility] issue on cross-examination and forcefully argue it in summation." *See Morgan*, 555 F.2d at 243. Thus, we cannot conclude that the district court abused its discretion in refusing Anekwu's proposed informant credibility instruction.

## VI.

At trial, Anekwu argued that he operated a legitimate business offering vacation packages, but was an absentee owner, unaware that Chipere (his employee) was running a fraud scheme. The Government's main witness was Chipere, who testified that he was involved but that Anekwu was the organizer. In addition, the Government called Sergeant Chun Ma, who testified that Canadian authorities cannot easily share information with U.S. authorities, because the process of getting information to the U.S. from Canada is a lengthy one. Then, when Ma was asked if extraditing someone to the U.S. took a long time, Anekwu objected. The objection was sustained.

In Anekwu's closing argument, his defense counsel stated: "At the end of the day, [Chipere is] not being charged either in Canada or the United States, because he's claiming he's a lower level employee, and he thinks as long as he tells the government what they want to hear, he won't be charged." Anekwu's counsel also stated that Sergeant Ma could have obtained a search warrant to Anekwu's business, but he did not. Sergeant Ma could have searched the business and, if Anekwu was guilty, the Government would have lottery documents, phone lists, and mail and letters from victims. "They don't have any of that in this case."

The Government's rebuttal closing argument included the following:

> You may be thinking and wondering well, why didn't we charge Mr. Chipere? There he is on the phone, there he is on tape. You know, what—why isn't the government just doing a clean sweep of everybody? Why didn't we charge Mr. Chipere? Why didn't we charge Stella Wells? Why didn't we charge Donald Craig? Why only Henry Anekwu?

Think about this, possibly the government is going after the heads of these organizations, the Wilson O[k]kikis, the Henry Anekwus, doing what it can in the difficult situation of crimes that occur across the border. You heard Chun Ma tell you it's not very easy to exchange evidence. You have to go through a lengthy cumbersome process just to get some bank records from Canada. Just to get somebody arrested in Canada. It's not an easy thing to do. It's not like just issuing a warrant and going outside and grabbing the person.

Anekwu did not object.

### A.

Anekwu argues that the Government committed prosecutorial misconduct, because the prosecutor in closing argument improperly expressed opinions on Anekwu's guilt and culpability. Anekwu also argues, but only in his reply brief, that the prosecutor's comments in closing argument improperly vouched for the credibility of Chipere. However, an appellant waives "arguments by failing to raise them in the district court or in his opening brief filed in this appeal. Issues raised for the first time in an appellant's reply brief are generally deemed waived." *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) (citation omitted). To the extent that Anekwu argues improper vouching, the argument is waived, because it was not raised in his opening brief.

Because Anekwu did not object at trial to the prosecutor's allegedly improper comments in closing argument, we review his remaining prosecutorial misconduct objections for plain error. *Wright*, 625 F.3d at 610.

### B.

A defendant must show both misconduct and prejudice to obtain reversal based on prosecutorial misconduct. *Wright*,

625 F.3d at 609-10. "[A] prosecutor may not express his personal opinion of the defendant's guilt . . . ." *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985). Further, a prosecutor may not express his or her view of the relative culpability of the defendant. *Id.* at 1211-12.

In *McKoy*, a testifying prosecutor "noted that he 'was interested in finding the ultimate source for the goods that were stolen.' " *Id.* at 1211. The prosecutor also said that one of the conspirators, who testified against the defendant, "was the least culpable." *Id.* We found "[t]he unmistakable message of this testimony was that, in the opinion of the former prosecutor, [the defendant] was the *most* culpable . . . ." *Id.* Thus, the conduct was improper. *Id.*

**[17]** On this record, we cannot conclude that the district court plainly erred. The unmistakable message of the prosecutor's comments here was not regarding the culpability of Anekwu. Rather, the prosecutor's comments supported the Government's theory that Anekwu was the head of the organization the Government was targeting. The prosecutor further suggested that the authorities had limited resources and therefore chose to go after the heads of such organizations, which is not obviously and necessarily about culpability. Additionally, Anekwu's counsel made comments in closing argument regarding Chipere, inviting the Government to respond. Even if the prosecutor's comments were improper, "where a prosecutor's improper arguments respond to the arguments of the defense, they may serve to 'right the scale' of justice." *McKoy*, 771 F.2d at 1212. Thus, we cannot conclude that the district court plainly erred in admitting the allegedly improper comments by the prosecutor.

## VII.

During deliberations, the jury asked the district court, "If someone other than the defendant takes contacts from Platinum Awards and continues the fraudulent activity, on his

own, is the defendant liable?" The court conferred with the parties' attorneys. Anekwu's defense counsel thought "the clear answer is no." The Government wanted to review *United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992), before giving an opinion. The court responded that it did not usually answer specific factual questions unless the answer is clear. The court recommended reading Instruction 30 (the co-schemer instruction).[4] Defense counsel agreed with reading Instruction 30, but she asked that Instruction 26 (the intent instruction) also be read.[5] The Government agreed, and the district court read the two instructions to the jury. The jury went back to deliberating. The court then asked each party to send *Lothian* to the court and for counsel to read the case. The court did not discuss the note further.

## A.

Because Anekwu did not object to the district court's response to the jury question, we review this issue for plain error. *See United States v. Ramirez*, 537 F.3d 1075, 1081 (9th Cir. 2008).

---

[4]The co-schemer instruction states:

   Each member of a scheme to defraud is responsible for other coschemers' actions during the course of and in furtherance of the scheme.

   If you decide that the defendant was a member of a scheme to defraud and that the defendant had the intent to defraud, the defendant is responsible for what other coschemers said or did to carry out the scheme even if the defendant did not know what they said or did.

   For a defendant to be found guilty of an offense committed by a coschemer as part of the scheme, the offense must be one that could reasonably be foreseen as a necessary and natural consequence of the scheme to defraud.

[5]The intent instruction states: "An intent to defraud is an intent to deceive or cheat."

**B.**

"The Supreme Court has clearly stated that it is reversible error for a trial judge to give an answer to a jury's question that is misleading, unresponsive, or legally incorrect." *United States v. Frega*, 179 F.3d 793, 810 (9th Cir. 1999). "When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Id.* at 809 (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946) (internal quotation marks omitted)). But "the precise manner by which the court fulfills this obligation is a matter committed to its discretion." *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003).

Our principles regarding co-schemer liability in the mail fraud context are as follows:

> • A knowing participant in a scheme to defraud is vicariously liable for substantive acts of mail fraud or wire fraud committed by co-schemers.

> • The acts for which a defendant is vicariously liable must have occurred during the defendant's knowing participation or must be an inevitable consequence of actions taken while the defendant was a knowing participant.

> • Vicarious liability for substantive counts of mail fraud or wire fraud does not require that a conspiracy be charged or proved.

*United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002). In *Stapleton*, we found the jury instructions at issue were sufficiently compatible with these principles, because "[t]he instructions limited vicarious liability to acts of co-schemers during the life of the scheme and acts that were reasonably foreseeable as a necessary and natural consequence of the fraudulent scheme." *Id.* at 1118.

Here, the jury asked: "If someone other than the defendant takes contacts from Platinum Awards and continues the fraudulent activity, on his own, is the defendant liable?" The question was phrased to elicit a "yes" or "no" answer, and such an answer may have favored one side over the other. Thus, the court had discretion on how to clear up the ambiguity. *See Arizona*, 351 F.3d at 994-95.

The co-schemer instruction here states that a "member of a scheme to defraud is responsible for co-schemes' actions during the course of and in furtherance of the scheme." Further, "[f]or a defendant to be found guilty of an offense committed by a co-schemer as part of the scheme, the offense must be one that could reasonably be foreseen as a necessary and natural consequence of the scheme to defraud." The co-schemer instruction is substantially similar to the instruction that we approved in *Stapleton*. *See* 293 F.3d at 1117-18. Therefore, without deciding whether the answer to the instruction is definitively yes or no, we conclude that the district court's response to the jury question was not plainly erroneous.

**[18]** While Anekwu argues that our case law requires reversal, the cases that Anekwu cites are distinguishable. In *United States v. Warren*, the district court abused its discretion in referring the jury back to the original instructions, because the jury indicated that it was confused by the original instructions and those instructions did not cover the point of confusion. 984 F.2d 325, 330 (9th Cir. 1993). In *United States v. Frega*, the district court's response to a jury question was substantively erroneous and the original jury instructions lacked needed information. *See* 179 F.3d at 808-10. Here, as *Stapleton* indicates, the jury instruction accurately stated the law. *See* 293 F.3d at 1118. In *McDowell v. Calderon*, we recognized that in death penalty cases, doubts about jury requests for guidance "should be resolved in favor of the accused." 130 F.3d 833, 840 (9th Cir. 1997) (en banc), *overruled in part on other grounds by Weeks v. Angelone*, 528 U.S. 225 (2000).

Additionally, "[t]he plain language of the jury's request for guidance demonstrate[d] that eleven jurors were confused about the law and erroneously believed they could not consider eight aspects of [the defendant's] background as mitigating evidence." *Id.* at 837. Here, Anekwu's case is not a death penalty case, and the plain language of the jury's note did not demonstrate that the jurors were affirmatively interpreting the law incorrectly. Thus, we cannot conclude that the district court plainly erred in re-reading the correct jury instructions to the jury. *See Arizona*, 351 F.3d at 995.

## VIII.

**[19]** "Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant.' " *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (quoting *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). Here, the only potential error by the district court was the refusal to give Anekwu's proposed informant credibility instruction. However, we cannot conclude that the district court plainly erred, because an accomplice instruction was given (warning the jury to be cautious about Chipere's testimony), and Anekwu's defense counsel was allowed to fully develop Chipere's potential motivations in cross-examination and in closing argument. Because there are no other potential errors, we conclude that reversal for cumulative error is not warranted.

## IX.

The U.S. Probation Office calculated two advisory Guidelines ranges for Anekwu's sentencing proceedings, because the applicable conduct occurred before and after November 2001. For the pre-November 2001 conduct, the offense level was 28 with a criminal history category of I, yielding a sentence range of 78 to 97 months. For the post-November 2001

conduct, the offense level was 32 with a criminal history category of I, yielding a sentence range of 121 to 151 months.

In the Government's Position Re: Sentencing Factors, under the category for factor (7) of 18 U.S.C. § 3553(a), the Government stated: "Defendant has no significant assets and will be deported to Nigeria following his incarceration in the United States. Thus it is highly unlikely that defendant will ever pay restitution to his victims. This is an aggravating factor."

The district court adopted the Probation Office's calculations. Then the court considered the factors in 18 U.S.C. § 3553(a). In the discussion of employment, the court recognized that Anekwu had no job, no assets, and his wife made approximately $2,000 per month, which was used to support their family. "As a result, the defendant will be unable to make any restitution payments, and it's painfully obvious to the Court, that the victims will not receive a penny of the money that was stolen from them." A moment later, the court stated:

> I also have considered restitution, and will enter an order of restitution in the amount of $510,840.75. I recognize that the lengthy period of incarceration that I will impose will mean that the defendant will be unable to repay the victims who lost money in this case, but I doubt that imposing a lesser sentence would impose a corresponding greater recovery for the victims. I realize that these victims would rather have their money returned to them, but unfortunately, although I will order the defendant to pay restitution, they should realize in these cases it's highly unlikely that there will be any recovery from this defendant.

The district court concluded that the advisory ranges sufficiently satisfy the purposes of sentencing. "Finally, . . . the

[c]ourt . . . considered the goals of sentencing and conclude[d] that the [c]ourt's sentence [was] sufficient, but not greater than necessary to meet the four purposes of sentencing." Anekwu did not object to the sentence at the hearing.

## A.

Sentencing is reviewed for an abuse of discretion. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). "[O]nly a procedurally erroneous or substantively unreasonable sentence will be set aside." *Id.* "Procedural sentencing errors raised for the first time on appeal are generally reviewed for plain error." *United States v. Burgum*, 633 F.3d 810, 812 (9th Cir. 2011). Because Anekwu did not raise any objections to his sentence before the district court, we apply plain error review.

## B.

**[20]** "[I]t is well established that the Constitution forbids imposing a longer term of imprisonment based on a defendant's inability to pay restitution." *Burgum*, 633 F.3d at 814. Even so, there is no "absolute constitutional bar to consideration of a defendant's financial status. . . . [A] sentencing court [may] consider the defendant's ability to pay restitution in deciding to impose a more lenient sentence." *Id.* at 815. "In sum, . . . the Constitution prohibits imposition of a longer prison term based on the defendant's poverty, although it does not forbid all consideration of the defendant's financial resources." *Id.*

In *Burgum*, the district court stated:

> One additional aggravating factor that I didn't mention is I just think realistically the chances of restitution in this case are probably slim, maybe even null in light of the amount of restitution being $258,280,

> Mr. Burgum not really having the finances or the financial condition to even pay a fine.

*Id.* at 814. We concluded that, "[b]ecause the district court cited Burgum's inability to pay restitution as one of the aggravating factors on which its sentence calculation was based, the error" was plain. *Id.* at 816.

This case is distinguishable from *Burgum*, because the district court did not explicitly reference or cite Anekwu's inability to pay restitution as an aggravating factor. Although the Government cited Anekwu's inability to pay as an aggravating factor in its Position Re: Sentencing Factors, the district court did not reference that document.

**[21]** More importantly, the record actually implies that the district court referenced Anekwu's inability to pay restitution to show that the court had considered imposing a lesser sentence to facilitate the payment of restitution. The court noted that Anekwu "will be unable to repay the victims who lost money in this case, but I doubt that imposing a lesser sentence would impose a corresponding greater recovery for the victims." *See also United States v. Rangel*, ___ F.3d ___, 2012 WL 2948544, at *5 (9th Cir. July 20, 2012) ("The district court in this case did not consider [the defendant's] inability to pay restitution itself as an aggravating factor in imposing a longer sentence, but focused instead on the impact on the victims of [the defendant's] crimes."). Additionally, the references to the inability to pay restitution seem to explain to the victims (some of whom were at the hearing) that they should not expect to receive any of the $510,840.75 ordered. In sum, the district court did not plainly err, because it is proper for a court "to consider the defendant's inability to pay restitution in deciding to impose a more lenient sentence," *Burgum*, 633 F.3d at 815, and the error, if any, "is [not] clear or obvious," *Wright*, 625 F.3d at 607.

## C.

Anekwu argues that the district court erred in sentencing him to 108 month and 78 month concurrent sentences, because the court found that the guideline ranges were "sufficient to satisfy the purposes of sentencing." He claims that if a 97 month sentence was sufficient, then a 108 month sentence must be excessive. When different counts apply to periods with different Guidelines manuals, different Guidelines ranges for those counts are appropriate. *United States v. Ortland*, 109 F.3d 539, 546 (9th Cir. 1997). Further, a sentence outside a Guidelines range is allowed and reviewed for reasonableness. *United States v. Hilgers*, 560 F.3d 944, 947 (9th Cir. 2009).

**[22]** Here, the district court considered and consulted the advisory Guidelines ranges, "find[ing] that the ranges adequately take into consideration the specific facts and circumstances of this case, and the ranges established by the guidelines are sufficient to satisfy the purposes of sentencing." The court ultimately sentenced Anekwu to 78 months imprisonment for the pre-November 2001 conduct (the lower end of the range) and to 108 months for the post-November 2001 conduct (a variance downward from the range of 121-151 months). The sentences were ordered to be served concurrently. When asked by the Government why the court varied downward from the post-November 2001 range, the court stated, "I have applied the 3553(a) factors in phase two, and looking at all of those factors, I conclude that that was the appropriate sentence to be imposed in this case." Thus, the district court did not err, because it sentenced Anekwu separately, using the appropriate separate Guidelines ranges.

Further, the sentence for the post-November conduct was a downward variance, which is allowed if reasonable. Anekwu did not challenge the reasonableness of the sentence, so we need not decide whether the 108-month sentence was reason-

able.

**AFFIRMED.**